# JOHN EDWARD JONES *v.* STATE OF MARYLAND

[No. 131, September Term, 1975.]

*Decided December 1, 1975.*

The cause was argued before MORTON, DAVIDSON and LOWE, JJ.

*F. Lee Bailey* for appellant.

*Albert Gallatin Warfield, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William E. Brannan, State's Attorney for Baltimore County,* and *Benjamin Bronstein, Deputy State's Attorney for Baltimore County,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court. DAVIDSON, J., dissents and filed a dissenting opinion at page 106 *infra.*

John Edward Jones was tried before a jury in the Circuit Court for Calvert County, and convicted of narcotic law violations, nearly two and one-half years after his initial arrest. It would be rare, indeed, had his arguments on appeal not included an assertion that he was denied a speedy trial. Although two of his other arguments are of constitutional dimension, it is the trial delays that give us most pause.

Part of our concern lies in the relative nature of the right itself, which is consistent with delays and dependent upon circumstances. *Beavers v. Haubert,* 198 U. S. 77, 87. The

bulk of our difficulty was the need to reconstruct those circumstances from cold records, docket entries, pleadings, occasional correspondence and excerpts from transcripts of numerous cases all related, if not directly connected, to appellant as their focal point.[1] The conclusion we have reached is that appellant was not denied a speedy trial. Despite his protestations from the beginning, the record strongly suggests that he did not want to be tried but hoped to take advantage of the delay by setting the scene to obtain his future deliverance. *Cf. Barker v. Wingo*, 407 U. S. 514, 535. The pattern of behavior of appellant and his counsel compel that conclusion.

I

The right to a speedy trial is guaranteed to the accused in tandem by the Maryland Declaration of Rights, *King v. State*, 5 Md. App. 652, and the Sixth Amendment of the Constitution of the United States, made applicable to the states through the Fourteenth Amendment, *Klopfer v. North Carolina*, 386 U. S. 213. In *Barker v. Wingo*, 407 U. S. 514, the Supreme Court prescribed the test by which to determine whether a criminal defendant has been denied this right.

Under the *Barker* test, the four factors we must consider from the time "the putative defendant . . . becomes an 'accused' . . ." *United States v. Marion*, 404 U. S. 307, 313, until his conviction at trial are: length of delay, reason for delay, prejudice to the accused and assertion of the right by the accused. None of these four factors is a prerequisite to the finding of the deprivation of appellant's right to a speedy trial. Neither is any one factor a sufficient condition to find a deprivation. "Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Barker*, 407 U. S. at 533. On the other hand, while failure to assert the right will not serve as a

---

1. Parts of the records submitted were provided by agreement of counsel expressed at argument.

waiver, *id.* at 524, an accused may by express agreement or by his conduct waive the right to a speedy trial just as he may intentionally relinquish any other constitutional right. See *Johnson v. Zerbst,* 304 U. S. 458.

## The Length of Delay

A delay of the length shown here of two and one-half years overall, is "presumptively prejudicial," *Barker v. Wingo,* 407 U. S. at 530 and surmounts the threshold question of whether there was a delay of constitutional proportions. *State v. Lawless,* 13 Md. App. 220, 229. We must then apply the three remaining factors of the exegetic test prescribed in *Barker v. Wingo, supra.*

## Assertion of the Right

The record is replete with demands for a speedy trial and motions to dismiss for lack thereof. The only evidence contradicting those express demands is of a subtle nature which will be discussed with the reasons for the delay. While we have given the assertions the "strong evidentiary weight" to which they are entitled "in determining whether [Jones] was deprived of the right," *Barker, supra,* 407 U. S. at 531-532, we will discuss that weight in more appropriate context.

## Prejudice

Appellant contends that three favorable witnesses, who would have been available at an earlier trial, were unavailable at his trial because two had died and one was missing. This is indeed a strong factor in appellant's favor. "If witnesses die or disappear during a delay, the prejudice is obvious." *Barker,* 407 U. S. at 532.

In *Epps v. State,* 275 Md. 96 at 120, while discussing "prejudice", the Court of Appeals reflected upon testimony lost due to the delay:

> "Although admittedly speculative, the testimony of [the missing witness] might have been sufficient to have generated a 'reasonable doubt' as to [Epps'] guilt."

We cannot conceive that the Court of Appeals intended to create a compelling presumption in favor of an accused who lays claim to a lost witness, that such testimony would be exonerative. For such allegation to weigh so heavily in appellant's favor we must accept without question the unsupported allegation 1) that the testimony would have been favorable and 2) that the witnesses would have been available but for the delay.[2] Even by adjusting the scale so favorably in appellant's favor (without the ballast he failed to provide) we perceive a missing ingredient. For the witness's absence to weigh so against the State, it is implicit that the delay must have been the fault of the State. We express our view prefatorily that none of the delay was solely attributable to the State by way of either neglectful or intentional procrastination.

In considering prejudice, we are additionally admonished by *United States v. Marion,* 404 U. S. at 320 to consider not only prejudice to his defense but whether the delay would:

> " . . . seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . disrupt his employment, . . . curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends."

*Strunk v. United States,* 412 U. S. 434, 439 recognizes that some of these factors may carry different weight where defendant is incarcerated after conviction in another jurisdiction. But even then prospects for parole and meaningful rehabilitation must be considered. While awaiting trial, appellant had been sentenced for an escape after his arrest and, by his own admission, had also been sentenced to 30 years by the federal court. There is nothing to indicate that these recently imposed sentences were subject to parole nor was it argued or alleged that parole was delayed by this case. Appellant's own attorney

---

**2.** Appellant's testimony that the deaths occurred in 1973 is our only guide as to the date to which the loss was attributable.

recognized this when he wrote appellant in November of 1974:

> "I cannot believe that since your freedom does not at the moment hinge on the outcome of this litigation that the inconvenience of a couple of weeks is the real purpose behind your letter of October 25, 1974."

*Barker* also recognizes that the factors discussed in *Marion* are more serious for some than for others but inevitably present in all cases, because every defendant will be restricted either by incarceration or bail. *Id.* at 537. Here, however, as we have noted, appellant was serving other sentences and the restriction was implicit with or without the delay.

## The Reasons for the Delay
## (The Record)

Soon after appellant was arrested on July 12, 1972 he escaped. He was returned near the end of the month by F. Lee Bailey, Esquire, the first of a procession of attorneys,[3]

---

**3.** The cover of the docket in this case lists the following counsel for Jones, apparently in order of their appearance: Robert H. Frank, William H. Murphy, Jr., F. Lee Bailey, Gerald Alch, Gerald Kroop, Stephen L. Miles, Stanley Needleman, William Carrier.

The following is a partial list of docket entries relating to Jones' legal representation:

8/21/72 - Order to enter the appearance of Stephen L. Miles.
10/13/72 - Order to enter the appearance of F. Lee Bailey and Gerald Alch.
10/13/72 - Order to enter the appearance of Gerald Kroop.
1/15/73 - Order to enter the appearance of William H. Murphy, Jr.
1/22/73 - Order to strike appearance of Stephen L. Miles.
6/7/73 - Order to enter the appearance of Robert H. Frank.
9/6/73 - Order to strike the appearance of Stephen L. Miles.

Robert H. Frank appeared as counsel for Jones on a number of motions filed up to 5/15/74. On 5/25/74 a hearing was held for the purpose of determining who Jones' counsel was. At that hearing Jones stated that Stephen L. Miles was his only attorney.

6/19/74 - Order striking Frank as attorney.
6/26/74 - Oral appointment of William W. Carrier.

At trial, Jones was represented by F. Lee Bailey with William W. Carrier as local counsel. However, during the course of the trial Jones repeatedly demanded different counsel.

hired and fired at random, and was indicted on July 27, 1972. Within three weeks the first of a series of local attorneys entered his appearance and the out-of-state law firm to whom appellant had surrendered himself wrote the State's Attorney requesting an extension on the deadlines for pre-trial motions set for the middle of the following month. Since appellant's motions for discovery, to suppress evidence, to disqualify the judge and for a jury trial were not filed until December 1, 1972, we assume the State acquiesced in that extension. Along with these motions appellant included a demand for speedy trial.

The State elected to proceed first on the escape charge. The case was decided (presumably on plea) in January of 1973. In the meantime, a motion was filed for change of venue. This motion is significant only in its characterization by the State as a delaying tactic "contrary to the express written agreement of the parties that the case would proceed on or after January 8th, without further delay. The Escape case is now set for January 9, 1973. The State vigorously opposes any delay."

1973 having thus begun with appellant's trial for escape, there followed closely the filing of several motions by appellant, the striking of appearance by one of appellant's lawyers and the entry of appearance of another. During the next two months of the year, the only apparent activity which followed the trial for escape seems to have been a hearing in open court on appellant's motion to suppress evidence, which was overruled on April 9, 1973.

The trial was set for June 25, 1973. However, on May 25, 1973, presumably because of the confusion surrounding the many lawyers representing appellant,[4] a hearing was held.

"THE COURT: Mr. Jones, stand up. The reason for bringing you to court today is to find out who is your lawyer. You change lawyers faster than I

---

4. The record is not clear to what extent the eight in-and-out counsel participated or were manipulated by this court-wise defendant in the obvious ploy of utilizing dilatory devices of repetitious pleadings and hindrance by confusion of eight lawyers going in different directions when they weren't striking their appearances, reentering appearances or defending themselves.

> change hats, and I want to know who is your
> attorney that represents you in this case? "

Ironically, appellant indicated that his only attorney in the case was Stephen Miles who had been permitted to strike his appearance after petition and an order signed January 18, 1973. Appellant renounced all other counsel, several of whom were present and moved to be permitted to withdraw. Nothing in the record shows that any counsel not then present were so authorized. It later becomes clear that several stayed on.

For reasons not completely clear from the record, but presumably because the State deferred to the federal courts, the June 25, 1973 trial date was not honored in spite of a hearing judge's observation that the State trial had precedence. We do know from appellant's own testimony that the federal case against him continued for six weeks during the summer of '73, bringing us toward the end of summer.

As fall approached, Stephen Miles, who had participated in the defense of appellant in the federal courts, again struck his appearance. This time the record provides a glimmer of light on the "circumstances" surrounding that episode which clearly contributed to the succeeding delay. From the pleadings and exhibits submitted by appellant, it is clear that two of appellant's counsel became personally embroiled in accusations of attempting to bribe an assistant State's Attorney relating to their defense of appellant, for which they were subsequently indicted and tried. Miles was indicted in July of 1973 and tried in March of 1974.[5] Frank was tried in February of 1973. Miles' motion to strike his appearance on September 9, 1973 recites indicia of animosity between him and his co-counsel Frank arising from accusations and counter-accusations of the bribe attempts

---

5. As inferential evidence of the disruptive nature of these proceedings there was at least one subpoena in the record demanding the court records of this case and the escape case for December 3, 1973 for the trial of State v. Miles. It should be noted that Mr. Miles was not found to be guilty of the offense charged.

stemming from their representation of Jones.[6] Miles'
appearance was struck. Frank and others stayed on.

In November of 1973 Frank again moved for a speedy trial
for Jones; however, there is an indication even here that
appellant did not desire that which he formally prayed. In
acknowledging a trial date set for February 26, 1974, Mr.
Frank included a statement that he did not waive his speedy
trial motion of November 11, 1973. A letter from the State's
Attorney to Mr. Frank clearly indicated that the State was
given informal assurances that the speedy trial issue would
not be pressed, notwithstanding the procedural prods of
renewed motions and written expressions of non-waiver for
the record. The letter dated January 9, 1974, a copy of which
went to the court, said in part:

> "I note with some chagrin your reference in your
> January 7th letter that you do not waive any
> speedy trial motion that was filed on behalf of Mr.
> Jones. My recollection of various conversations
> with you in the Court House in Baltimore County
> was that you were not necessarily concerned with
> the trial of the Jones case but only in plea
> negotiations. In fact, at one time you indicated that
> you would be more than happy to accept a stet in
> the case of Mr. Jones providing the State would
> return the money seized from him at the time of his
> arrest. Of course, you will remember at that time I
> told you to give an appropriate four letter word
> greeting to Mr. Jones in response to that demand.
>
> At other times during these conversations, your
> only request was that in any trial that the State
> Nol Pros the proceeding against Mr. Strickland so
> that you would not have a potential conflict of
> interest with your representation of Messrs. Jones
> and Strickland. In view of possible motions that

---

6. *See* Maryland St. Bar Ass'n v. Frank, 272 Md. 528 in which Frank was
disbarred effective November 7, 1974, for admitting payment of $3,000 to a
deputy State's Attorney, Stuart Hirsch (*see* Md. St. Bar Ass'n v. Hirsch, 274
Md. 368) in order to influence the outcome of a case then pending.

may be filed and in view of confusion concerning the representation of the defendants in this case, I am requesting Judge Proctor to set a pre-trial hearing date before the Court at which time all pre-trial motions would have to be filed and a final determination of representation by counsel be made."

While not conclusive of defense procrastination, that letter first gave voice to what appears implicit throughout the record. Although appellant's continued demands for speedy trial clearly preserve the issue, and are entitled to strong evidentiary weight, *Barker, supra,* 407 U. S. at 527, as with any evidence the weight given it " . . . must be considered together with such other circumstances as may be relevant." *Barker, supra,* 407 U. S. at 533.

An additional delay was explained by Judge Kenneth C. Proctor in a letter to counsel explaining the necessity for postponing the February 26, 1974 trial date. The letter said:

"Sometime ago I scheduled the above captioned case for trial commencing on February 26, 1974, at that time anticipating that there would be no problem in making a Judge available for the trial of this case.

However, with the trials of cases resulting from the investigation of the State's Attorney's Office, it has been necessary for us to send a Judge into Baltimore City, in exchange for the Judge from the Supreme Bench who must come out to Baltimore County, to preside at the trial of such cases. This, of course, leaves us shorthanded for the trial of cases in the regular assignment. In addition to this, at the time you made your request, Judge Walter R. Haile, who is handling the Criminal Jury assignment this term, had already scheduled cases to the end of March, so that I could not assign him to the trial of the above captioned case.

For these reasons the above captioned case will have to be removed from the trial assignment for

February 26 and rescheduled for sometime during the April Term of Court."

The "investigation of the State's Attorney's Office" is a reference to a gubernatorial directive proclaimed on November 13, 1972, *Irvin v. State*, 23 Md. App. 457, 458-59, constitutionally authorizing the Attorney General

" . . . to investigate the allegations of corruption of public officials in connection with the arrest, pending prosecution and escape of one John Edward Jones, from the Baltimore County jail, and to pursue any evidence of criminal violations or administrative irregularities resulting from your investigation." *Green v. State*, 25 Md. App. 679, 704.

The very sketchy and discordant record (partially attributable to the refusal of the trial judge to hear evidence proffered by the State and appellant's response) does not disclose the extent nor the dates of this investigation. We know of Miles' indictment in July of 1973, and we know of Frank's disbarment effective November 7, 1974 for having admitted payment of $3,000 on September 21 or 22, 1972, to Deputy State's Attorney Stuart Hirsch in order to influence unlawfully the outcome of a case which may or may not have been that pending against appellant and his co-defendants.[7] *Maryland St. Bar Ass'n v. Frank*, 272 Md. 528. Notwithstanding the failure of the State to provide us with a record clearly setting out these dates and events, we cannot close our eyes to that which is recorded for posterity in our own opinions and in those of the Court of Appeals.[8]

On December 4, 1974, appellant was finally brought to trial in the Circuit Court for Baltimore County. However, a motion for change of venue was filed by appellant and granted on December 5, 1974. The trial was transferred to

---

7. That was denied by Frank; however, the entire investigation was founded upon that assumption. See Green, *supra*, 25 Md. App. at 704.

8. There is some authority that we might have sought court records and statistics even beyond appellate opinions, Davidson v. Miller, 276 Md. 54, n. 7 but we decline to do so, fearful of the encompassing precedential effect.

the Circuit Court for Calvert County to commence on December 11, 1974.

On the day of trial in Calvert County, appellant made every effort to keep it from being tried, including another attempt to fire counsel and hire another. He asserted flat out that he was not prepared to proceed and offered every conceivable reason for further delay. He even had the audacity to ask for time to "think of something else."

> "THE DEFENDANT: First of all, your Honor, I ain't prepared to go to trial for this case. I've been putting in for a speedy trial for two and a half years and I didn't even know I was coming to Court today, the trial was coming to Court today and I ain't seen F. Lee Bailey for two and a half years. He ain't investigating the case properly. I've got three hundred and some witnesses I'd like to call in this case. I don't know what the State's Attorney talking about he's going to rush this case in three days. He's going to railroad me. He's going to railroad me right. He railroaded me once in Federal Court on the same charge and I got thirty years for it, so if you're going to railroad me in three days, just railroad me in three days. I've got three hundred and some witnesses to call. If he can call the Police here to testify against lies, I can call witnesses to counteract the Police to testify against me, my witnesses. My witnesses are all over the United States. I ain't even got Subpoenaes or nothing to call them. It might take three days to get one of them here.
>
>                                   . . .
>
> JUDGE BOWEN: Anything else you've got to say?
> THE DEFENDANT: Yes, sir. I ain't prepared to go to trial and I'd like to call my witnesses on open Court motion before the trial starts.
> JUDGE BOWEN: Anything else?
> THE DEFENDANT: I'd like to have a recess so I can think of something else and read my file."

With two of his lawyers by his side, appellant initially chose
to conduct his own defense, complaining that he no longer
wanted to be represented by the counsel present, F. Lee
Bailey and William Carrier, but had only recently decided to
hire another, "Jeff Hoffman." Appellant's continued protests
and interruptions became so disruptive that the judge, after
repeated warnings, had him first shackled and gagged, then
manacled, and finally removed from the courtroom only to
be permitted to return when he agreed to conduct himself
decorously. At every opportunity, however, he repeated that
he was not prepared for trial.

> "Q All right. Do you have anything else you want
> to tell the Judge about the Speedy Trial Matter?
>
> A Not other than I just been trying to come to
> Court for this two and a half years and every time
> they postpone it, it is the State's fault. And then
> they rush me today and I wasn't prepared to come
> to trial."

## The Reason for the Delay
## (Conclusions)

As is obvious from the facts as briefly outlined, the delay
in bringing Jones to trial can be laid to both the State and to
the defense, notwithstanding the appearance that "This
period of delay resulted solely from the prosecutor's tactical
decision . . . and the passive cooperation of the court with no
heed being paid to [Jones'] unequivocal request. . . ." See
*Epps, supra,* 276 Md. 96. The root cause of the delay here,
however, was not solely "governmental action." Although
nearly all postponements were initiated by the State [9] (which

---

9. Twice appellant acknowledges in his brief that "Defendant Jones
arguably waived his speedy trial right from June of 1974 forward until
November 18, 1974, in order that counsel of his choice could be
present . . . ." In light of his previous letter of April 5, 1973, this might be
construed to be rather a broad reaffirmation of the forward waiver "until
such time as the court is notified to the contrary," than to be limited to the
postponement sought in the same telegram as appellant would have us
believe. Exhibits of correspondence indicate a postponement from
November 18, 1974 to December 2, 1974, when the trial was begun in
Baltimore County. It was removed after mistrial on appellant's motion
and tried in Calvert County on December 11, 1974, within a week.

includes court action, see *Epps, supra,* 276 Md. 96) that naked fact overlooks the underlying cause of the delay, and is otherwise counterbalanced by expressed efforts of both prosecutor and court, to bring the case to trial. Delays caused by other trials of appellant and of appellant's attorneys cannot be weighed against the State especially when the priority given is so obviously to effect justice rather than to obtain a prejudicial advantage. We are bound by the Court of Appeal's holding that overcrowded courts, and inferentially court congestion, is not a neutral reason for excusing a delay. *Epps, supra,* 276 Md. 96. But when that congestion is traced back to the defendant's doorstep, the confusion of clearing out the corruption brought to light by actions of his own lawyers is a far cry from the "tactical decision" of the prosecutor in *Epps,* "to try the defendants jointly."

A substantial part of the delay related to the indictments and trials of appellant's attorneys and the State's Attorneys, part was occasioned by other trials of appellant, and part was at the behest of appellant's counsel. All of these were in large measure beneficial safeguards helping to assure appellant of obtaining a fair trial. The reason for the investigation of the prosecutors, as well as his own counsel, regardless of its unrelated result, provided a degree of assurance that he would be fairly tried and fairly represented. Whether or not that is what appellant wanted, it is that only to which he was entitled. *Tipton v. Warden, Maryland House of Correction,* 28 Md. App. 206. The speed of coming to trial varies with the circumstances of each case.

> "However, in large measure because of the many procedural safeguards provided an accused, the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself. Therefore, this Court has consistently been of the view that 'The right of a speedy trial is necessarily relative. It is consistent with delays and

depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice.' *Beavers v. Haubert,* 198 U. S. 77, 87, 49 L.Ed. 950, 954, 25 S. Ct. 573. 'Whether delay in completing a prosecution ... amounts to an unconstitutional deprivation of rights depends upon the circumstances.... The delay must not be purposeful or oppressive,' *Pollard v. United States,* 352 U. S. 354, 361, 1 L.Ed.2d 393, 399, 77 S. Ct. 481. '[T]he essential ingredient is orderly expedition and not mere speed.' *Smith v. United States,* 360 U. S. 1, 10, 3 L.Ed.2d 1041, 1048, 79 S. Ct. 991." *United States v. Ewell,* 383 U. S. 116, 120.

That appellant was at the vortex of this unique corruption investigation is a circumstance peculiar to this case. Faced with the unprecedented gubernatorially mandated corruption investigation of both prosecutors and defenders of the accused, the State had two alternatives. It could press for Jones' trial in spite of the investigation and indictments so closely related to it and thus provide Jones with the speed to which he claims entitlement; or, it could chance delay and ferret out the truth, assuring Jones as well as society that whatever the result of the trial, it was not conducted under a cloud of corruption. Jones was entitled to a fair trial and a speedy one. It was clear that the State could not assure him of both. Between "these nice sharp quillets of the law," the State sacrificed speed for certainty of fairness, an assurance that enured to the benefit of appellant. We can more readily assess responsibility for the period of delay between the bribe in September of 1972 and the disbarment of Frank in November, 1974, against Jones than we can charge it against the State. Of the two, the State's motives seem less impugnable. At worst we find the circumstances a "neutral" one.

We could hardly be expected to hold the State solely accountable for that portion of the delay attributable to the investigation and peripheral confusion. The proportion of fault attributable to society's attorney as cause for the delay is no greater than, if as great as, that attributable to

appellant's attorneys. As persistent as Messrs. Frank and Miles were in their demands that Jones be tried speedily, it was their conduct which brought on the delaying investigation, albeit, it was "ordered" by the State (governor). Jones, however, would "hold with the hare and run with the hound." He clutches to their assertions of the speedy trial on his behalf, but denies responsibility for their contribution to the cause of delay.

On April 5, 1973 F. Lee Bailey's office wrote the court indicating that the "defense does not demand an immediate trial until such time as the court is notified to the contrary." [10] The following month Jones represented to the court that he was going to fire all lawyers except Miles. Evidence from later correspondence of Bailey appear to support that result both by his letter of October 14, 1974 and Alch's telegram on June 26 which purported to "enter" Bailey's appearance. However, neither Bailey nor Alch ever struck their appearance first entered in the summer of 1972. They neither sought leave to withdraw nor did the court provide such leave pursuant to Md. Rule 751. Although Bailey and Jones were apparently at odds, it was Bailey who was ultimately present to represent Jones at his trial and still on this appeal. It was also he who once again requested a postponement when the June 26, 1974 trial date aborted and was to be reset for November 18, 1974. This was performed by Mr. Alch of Bailey's office who concluded the telegram requesting postponement with the sentence that "Jones has agreed to waive his right to a speedy trial." [11]

Interspersed throughout the entire period before and after these apparent waivers were sent, are demands for speedy trial by other lawyers who came and went before the final trial date, and by Jones himself; however, the record

---

**10.** Mr. Bailey attempted to assuage the effect of that letter as a waiver by explaining the circumstances which gave rise to it. He explained that he too had been indicted — in Florida — and having filed a motion for speedy trial himself was compelled to stand ready in his own defense. Although the explanation was commendably frank, we may not consider its weight since it was no part of the record by stipulation or otherwise.

**11.** A third deferment was obtained by Bailey who requested a postponement of the November 18, 1974 trial date for two weeks by his letter of October 14, 1974 abovementioned.

continued to reflect Bailey's continued appearance and the standing waiver "until notified to the contrary." Bailey's renewed waiver in June (through Alch's telegram) interpretatively supports the appearance of a continuing waiver by counsel of record. Whether or not this pattern of conduct was "manipulated by Jones we know not. It is apparent that he has sought the advantage of it through the very lawyer who sang the Siren's song, luring the State to founder upon the rocks of delay. If the positions represented by Bailey's office were not waivers, they were representations of record which together with the other "circumstances" substantially remove from the State some of the onus of delay.

There is also evidence in the record that a portion of the delay was caused by plea negotiations engaged in by Jones, his attorneys, and the prosecutors. The "circumstance" surrounding the January 9, 1974 correspondence above quoted was clearly that some plea bargaining was being carried on at least up to that time. This is supported subsequently by a motion filed charging a violation of a plea bargain. Although we are told that overcrowded courts "may not be a 'neutral' reason for delay," clearly plea negotiations are attempted not only by the State for the benefit of society, but by the accused for his own purposes as well.

Neither plea negotiations, the representations of counsel of record, confusion by repeated hiring and firing of counsel, the corruption investigation, related trials in other courts, nor the resolution of the procedural motions, as a single factor, even when carried on over a prolonged period, may condone an excessive delay in coming to trial. Two and one-half years has the appearance of prejudice even where an accused must be dragged to trial kicking and screaming as was Mr. Jones. Yet where such delay may not be readily forgiven, circumstances (which alter every case) *may* permit that it be excused.

### The *Barker* Result

In *Barker, supra,* 407 U. S. at 535, the Supreme Court concluded upon review that "Barker did not want a speedy

trial," and it declined to reverse his conviction in spite of a *five year* delay. The Court surmised that:

"The *probable reason* for Barker's attitude was that he was gambling on Manning's [a co-defendant] acquittal. The evidence was not very strong against Manning, *as the reversals and hung juries suggest,* and *Barker undoubtedly thought* that if Manning were acquitted, he would never be tried." (Emphasis added).

The Court does not spell out to us the reasons for their conclusion. The opinion merely tells us that:

" . . . *the record strongly suggests that* while *he hoped* to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges, he definitely did not want to be tried." (Emphasis added). *Id.* at 535.

The record here also "strongly suggests that [Jones] hoped to take advantage of the delay" to which his actions and the actions of his lawyers had contributed (if not caused) and thereby obtain a dismissal of the charges. It further not only "strongly suggests" but rings out the message that Jones did not want to be tried. Our suspicion is raised not only by Jones' apparent manipulation of the legal counsel representing him, nor by his involvement in pending negotiations, but also by his own proclamation when he eventually came to trial that he was not yet ready for it even then.

In May of 1974 Jones filed motion upon preliminary motion, some new and some seemingly repetitious, all of which required considerable time to respond properly or hear. Among these were motions for dismissal (for lack of speedy trial among other grounds), particulars, exculpatory evidence, inspection of grand jury minutes, severance (which was granted), etc. The content of some of the motions, such as the ones related to discovery, indicate preliminary preparations and negotiations being attempted by the defense which simply are not in concert with his persistent

formal demands for speedy trial.[12] But even more compelling is the correspondence from out-of-state counsel expressly negating demands for speedy trial. The delays attributable to Mr. Bailey's office request were concededly recognized, if not condoned by appellant in November of 1974. The intermittent hearings on the plethora of motions filed by his attorneys from time to time were also "procedural safeguards provided an accused." *Ewell, supra,* 383 U. S. at 120. Appellant's many legal gladiators obviously differing in the use of the constitutional right to speedy trial used it alternately first as a sword then as a shield. "Delay is not an uncommon defense tactic" *Barker,* 407 U. S. at 521, and appellant used it to the very end when, after an aborted trial December 4, 1974, he continued his avalanche of motions including a motion for psychiatric evaluation and a successful effort to have the case removed to its final situs in Calvert County.

As to the State, we found not one scintilla of evidence that the delay was intentionally "purposeful or oppressive," *Pollard v. United States,* 352 U. S. 354, 361, nor even that it was negligent which is "[a] more neutral reason. . . ." *Barker, supra,* 407 U. S. at 531. The record shows continued activity; the delays were at varying stages acquiesced in and contributed to by appellant.

Upon most appeals a reversal means a remand for a new trial, but

> "[t]he amorphous quality of the right [to a speedy trial] . . . leads to the unsatisfactorily severe remedy of dismissal of the indictment when the

---

12. No inference should be drawn that we are implying a deterrent to filing of preliminary motions. We simply point out that when motions are filed (and/or refiled) which presuppose judicial deliberations before decision, the state of mind of movant may not be that he is prepared to proceed immediately. For example, discovery may, and often does, provide the basis for the course of a defense which may not be planned until the motions are disposed of. When discovery is requested simultaneously with a demand for speedy trial, the defendant must mean that he is not at that moment prepared to go ahead but anticipates that he will be prepared to proceed expeditiously (within a reasonable time) after the discovery motions are decided. What is reasonable thereafter would also vary with the success of his discovery efforts.

right has been deprived." *Barker, supra,* 407 U. S. at 522.

When the nature of the remedy so enhances the potential danger to society, we must be especially careful not to permit legal fictions to obscure our common sense. If we close our eyes to what is there because by its nature it is difficult to discern or to articulate — or because it was not transcribed in a simple record for easy review — the only alternative is the serious consequence of a criminal fairly convicted on abundant evidence that will be freed with a recidivistic potential made more likely because he "beat" the charge.

The lingering question we must answer in the face of appellant's repeated demands is, whether the State discharged its "constitutional duty to make a diligent, good-faith effort to bring him . . . [to] trial"? *Smith v. Hooey,* 393 U. S. 374, 383. Our unequivocal answer is yes.

## II

Appellant next contends that the court erred in denying his motion to dismiss on the basis of collateral estoppel. The short answer here (contrasting our prolonged speedy trial analysis) is simply that the record does not provide us with evidence that the issue litigated in the federal court is the same as that here determined. Appellant's prosecution below was for acts committed on July 11 and 12 of 1972. He asserts in his brief reliance upon an acquittal in the summer of 1973 for a similar offense "on or about July 31, 1972." Since both charges had at their base possession of narcotics on dates over three weeks apart, we fail to see the logical application of the double jeopardy offshoot — collateral estoppel.

## III

Appellant's third assignment of error is meritorious. A conviction of simple possession of heroin charged in count 2 merged with the conviction of possession of a sufficient quantity reasonably to indicate an intent to distribute in

count 1. We will, therefore, vacate the verdict and sentence of the lesser charge, *Gray v. State*, 10 Md. App. 478, which sentence was concurrent in any event.

## IV

Appellant's initial requests for instructions were not in the record. His description of the request denied, of which denial he complains, is included by way of objection following the instruction:

> "Mr. Bailey: May it please the Court, may the record show that prior to the giving the charge to the jury I presented a number of instructions, all was given save one and that one was that the instructions of the Court are the sole and exclusive source of the law and the jury may find the law from no other source than the instructions of the Court and that they are absolutely obligated to follow those instructions, particularly those of constitutional dimension; the most important of which in all the circumstances of this trial is the impermissible nature of drawing an inference from the silence of the Defendant; a right upon which the Court has spoken very clearly."

It is manifest in the request so described that appellant objected to the court's instruction pursuant to our unique State Constitutional procedure in Section 5 of Art. XV which reads:

> "In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction."

Unquestionably the judge understood that to be the case:

> "JUDGE BOWEN: For the purposes of the record, what Mr. Bailey says about the instruction which he requested; that is, that the law as the Court gives it is binding and mandatory upon the

jury and may not find it otherwise is correct. Mr. Bailey and counsel for the State discussed this matter at length when the instructions were discussed. He requested in the instructions that this be given. The Court indicated at that time we would not give the instruction but would give him an exception at the conclusion of the charge, both to the Court's refusal to give it in the original instructions and to now refuse to go back and now give it as an amended instruction.

The Court understood precisely the material which Mr. Bailey requested and we think that the exception should and is intended to preserve for all appropriate appellant review the issue of whether or not such instruction would violate the Defendant's right of the United States' Court [Constitution]."

It thus becomes clear that the instruction to which exception is taken is that portion saying:

"Now you are advised that this does not mean that you are free to make law or change the law or to find it as you think it was yesterday or will be tomorrow or ought to be today. Your responsibility to the best of your ability is to determine what the law at the present time is insofar as it pertains to the matters before you in this case and you apply that law, as you find it to be, to the facts as you find them to be. Therefore, everything the Court says to you in these remarks is advice only. You are not obliged to follow it and counsel should they wish **to do so, will be permitted to argue to you that the** law is other than as the Court advises you it is.

Parenthetically we note, then, that it was clearly understood that the question sought to be preserved and presented to us is that expressed by appellant in his brief, *i.e.*:

"Whether the Maryland Constitution establishing

the jury in a criminal case as judge of law as well as fact and the judge's charge to that effect is violative to federal constitutional due process requirements binding upon the states."

The pains to which we have gone in setting out the question serve a twofold purpose. First we accept head-on appellant's renewed attack on Section 5 of Art. XV. Secondly, we make it quite clear that appellant did not ask that the jury be instructed that its role as judges of the law carried with it no right to pass on constitutional matters, *cf. Hitchcock v. State*, 213 Md. 273, or to withhold constitutional safeguards. See Md. Rule 756 f and g. It is because appellant's argument necessarily presupposes that the jurors rejected the constitutional safeguards of which they were advised, that we have pinpointed his attack as a frontal one against the jury's role under the Maryland Constitution and not a peripheral one asking for instructions of one or more of the limitations upon that role as set out by the Court of Appeals in *Giles v. State*, 229 Md. 370, 382-386. Appellant made no such request below, nor does he indicate any interest upon appeal as to what extent, if any, such qualifying instructions should be granted upon request.

His argument is a most beguiling one but hardly convincing. He contends that the instruction given the jurors under Md. Constitution, Art. XV, Sec. 5 is a denial of due process. He notes especially that one charged with so heinous a crime as heroin distribution, and who comports himself so reprehensibly in the courtroom as to require his being bound, gagged and finally removed, can hardly expect a juror to cloak him with the presumption of innocence when he is told by the judge that the instruction to that effect is advisory only. Such juror is expressly told, goes the argument, that *he* is the sole judge of the law, therefore, he is free not only to disregard the presumption of innocence but also to lessen the State's burden of proof from beyond a reasonable doubt to a level of hardly requiring any doubt at all.

Appellant now argues that the "trend" of the Supreme

Court decisions is firmly fixed in protecting the presumption of innocence by strictly holding the State to its burden of proof beyond a reasonable doubt throughout the trial. *E.g., Mullaney v. Wilbur,* 421 U. S. 684, 44 L.Ed.2d 508.

Regardless what our personal opinion of Art. XV, Sec. 5 may be, we are not the forum for change. Constitutional change in Maryland must be initiated by the Legislature and consummated by the people. Beyond that, in this State the Court of Appeals is the final word on constitutional validity, and that which it speaks binds us to the result. The Court of Appeals has repeatedly spoken on this subject. The Supreme Court has itself recognized this unique, if not archaic, practice and by such express recognition approved it *sub silentio.* The history of court review of this provision was reviewed in an alembic for this Court by Judge Scanlan in *Wilkens v. State,* 16 Md. App. 587, 604-605:

"The constitutionality of Article XV, Section 5 has been repeatedly upheld by the Court of Appeals and by this Court. *Slansky v. State,* 192 Md. 94, 63 A. 2d 599 (1949); *Giles v. State,* 229 Md. 370, 183 A. 2d 359 (1962); *Avey v. State,* 1 Md. App. 178, 228 A. 2d 614 (1967); *Lewis v. State,* 2 Md. App. 678, 237 A. 2d 73 (1968); *Avey v. State,* 9 Md. App. 227, 263 A. 2d 609 (1970). Moreover, the Supreme Court of the United States has had occasion to consider Article XV, Section 5, but has failed to intimate doubts about the constitutionality of the provision. In *Giles v. Maryland,* 372 U. S. 767 (1963), the Supreme Court dismissed an appeal which raised this issue, along with others, for want of a substantial federal question. See also *Brady v. Maryland,* 373 U. S. 83 (1963), in which the court discussed Article XV, Section 5 without questioning its constitutionality.

The whole question was carefully addressed by the Fourth Circuit, speaking through Judge Soboleff, in *Wyley v. Warden,* 372 F. 2d 742, 744 (4th Cir. 1967). In that case, the Fourth Circuit

rejected Wyley's challenge to Article XV, Section 5, based upon a claim that the provision denied him due process and equal protection of the law in violation of the Fourteenth Amendment."

The opinions of those two Courts of finality as we expressed them, have not changed. As recently as 1974 both Courts declined to review that question when it denied certiorari in *Bremer v. State,* 18 Md. App. 291, 349-350, *cert. den.* 269 Md. 755, *cert. den.* 415 U. S. 930.

> *Judgment affirmed except conviction and sentence under count 2 vacated as merging with the conviction under count 1.*
> *Costs to be paid by the appellant.*

*Davidson, J., dissenting*:

Upon my constitutionally mandated independent appraisal of the record, I am persuaded that John Edward Jones was denied his constitutional right to a speedy trial. I respectfully dissent.

## I. Length of Delay

Two and one-half years elapsed between Jones' arrest and trial. I agree with the majority that this delay was long enough to require scrutiny of the interrelated factors involved in the sensitive balancing process of determining whether an accused has been denied his right to a speedy trial.

## II. Reasons for Delay

On 12 July 1972, Jones was arrested and taken to the Baltimore County Jail. Almost immediately he escaped. Upon the advice of F. Lee Bailey, an attorney, Jones surrendered himself within a matter of days. On 27 July, Jones, Kevin Darby, a/k/a Kevin Jones, Brenda Lou Pinkett and Andrew Strickland were jointly indicted for narcotics

violations (No. 44607) allegedly committed on 12 July. In a separate indictment (No. 44609) Jones was charged with escape. On 21 August, Stephen L. Miles, a local attorney, entered his appearance for Jones. On 13 October, F. Lee Bailey and his associate, Gerald Alch, out-of-state attorneys, and Gerald Kroop, a local attorney, also filed their appearances.

By 17 October, the prosecutor had made the tactical decision to try the escape charge first. A trial date of 29 November was suggested. Alch objected to trial of the escape charge before trial of the narcotics charges because such action "would illegally prejudice the defendant." He asserted Jones' desire for an immediate trial by asking that the narcotics charges be tried first. He requested a change in the suggested trial date, explaining that Bailey would be unavailable.

On 25 October, the court, after setting deadlines for pretrial motions, ordered that "trial of this case will be scheduled no later than December 15, 1972." No explanation was offered as to why a trial date was not then set. On 6 November, after extending the deadlines for pretrial motions at Bailey's request, the court reiterated that trial of the narcotics charges would be scheduled no later than 15 December. No trial date was set. No explanation was offered. By 1 December, Jones filed a flurry of timely motions. No trial was held and no trial date was set on 15 December 1972. No explanation was offered.

The five month delay between 12 July and 15 December 1972 was not excessive and is attributable to the orderly processes of the law, a "neutral reason" for delay. By 15 December the case was ready for trial, and the responsibility to bring it to trial rested upon the State.

On 2 January 1973, Jones filed a motion for speedy trial with respect to the narcotics charges, invoking his constitutional right to speedy trial, entitling his case to special attention which is something more than that accorded by the "orderly processes of the law." Nevertheless, the orderly processes of the law moved on.

On 11 January, Jones then represented by Bailey, pled guilty to the escape charge and was sentenced to a term of 13 months. No trial date for the narcotics charges was set. No explanation was offered. On 15 January, William H. Murphy, Jr., a local attorney, entered his appearance and on 22 January, Miles struck his appearance. Notwithstanding the fact that Jones was at all times represented by counsel, no trial date was set. No explanation was offered. On 5 April, Bailey indicated that because of his other commitments, "the defense does not demand an immediate trial until such time as [the court is] notified to the contrary."

The three and one-half month delay from 15 December 1972 to 5 April 1973 resulted first from the prosecutor's tactical decision, made over Jones' objection, to try the escape charge before the narcotics charges, and thereafter, from the State's indifference and neglect in failing to set a trial date, despite Jones' motion for speedy trial. All of this delay must be attributed to the State. While indifference and neglect are more neutral reasons than a deliberate attempt to delay the trial, delays caused by either must be attributed to the State.

On 3 May, Jones was indicted for violation of federal narcotics laws (C.A. No. 73-0268, D.C. Md.). No date was set for trial of the narcotics charges pending in the State court. No explanation was offered. On 25 May, notwithstanding that Jones was then represented by Bailey, Alch, Kroop and Murphy, a hearing was held, according to the court, to determine who represented him. Miles, Kroop and Murphy were present. The following colloquy ensued:

. . .

"THE COURT: Now, who is your attorney that is going to represent you in this case?

"MR. JONES: Steve Miles on that.

"THE COURT: Mr. Miles is to be your attorney?

"MR. JONES: Yes.

"THE COURT: Is he the only attorney that you want to represent you?

"MR. JONES: Yeah.

. . .

"THE COURT: Also Mr. F. Lee Bailey's appearance has been entered. Do I understand that you don't want Mr. Bailey to represent you?

"MR. JONES: No.

"THE COURT: Have you advised Mr. Bailey of that election on your part?

"MR. JONES: Yes.

"MR. MILES: Your Honor, I have just shown the State a copy of a letter Mr. Jones wrote in my presence on the 22nd of May discharging him from the case. I also spoke to Mr. John Truman of his office yesterday and informed him of the provisions of the letter and these proceedings.

"THE COURT: Mr. Truman was down here for the hearing on the motions earlier, but the appearance entered is Mr. Bailey and Gerald Alch.

"MR. MILES: I understand they were both unavailable because they're both hither and dither.

"THE COURT: But both of them are discharged as counsel by Mr. Jones; is that correct?

"MR. JONES: Yes."

Jones, having discharged Bailey and Alch because he "didn't want [them] to keep holding this case up," stated that he did not want to be represented by Murphy and Kroop. Motions made by Kroop and Murphy to strike their appearances, were granted, but the appearances of Bailey and Alch were not stricken. As a practical matter, thereafter Jones was represented only by local counsel.[1] Because Jones had then revoked his consent to further delay, the responsibility for

1. On 14 October 1974, Bailey acknowledged that he had been discharged by Jones. The record shows that from 25 May 1973 through 26 June 1974, Bailey and Alch were inactive in this case. All activities relating to it, including the setting of trial dates, were conducted by the prosecutor and the court exclusively with local counsel, and without consultation or participation by Bailey and Alch.

bringing the case to trial once again rested upon the State. The one and one-half month delay from 5 April to 25 May 1973 is attributable solely to Jones.

At the 25 May hearing, the prosecutor announced that co-defendant Kevin Darby had recently been killed. He estimated that the narcotics trial would require only three days. After determining that trial of the federal case had not yet been scheduled, the court set the trial of the State narcotics case for 25 June. No explanation was offered why an earlier date was not chosen. On 7 June, Robert H. Frank, a local attorney, entered his appearance as co-counsel with Miles.

The trial set for 25 June did not take place. On 18 June, only 46 days after Jones' federal indictment, his federal trial began. The trial ended on 21 July. Jones, who had been represented at this trial by Miles, was convicted and sentenced to a term of 30 years.

The nearly one month delay which occurred between 25 May and 18 June 1973 was an unexplained delay attributable to the State. The one month delay from 18 June to 21 July 1973, caused by the federal trial, was caused by a neutral reason. On 21 July, the obligation to bring Jones to trial was once again placed on the State. The orderly processes of the law ground on. No trial date was set. No explanation was offered.

On 6 September, Miles struck his appearance. Frank remained counsel of record. On 14 November, Jones made another motion for speedy trial. The orderly processes of the law continued. No trial date was set. No explanation was offered.

A new trial date was set 26 December 1973, when the prosecutor and Frank agreed upon a tentative trial date of 26 February 1974, subject to confirmation by the court. The unexplained five month delay from 21 July to 26 December 1973 must be attributed to the State.

On 7 January 1974, Frank reasserted Jones' desire for speedy trial in writing, and said that his agreement did "not waive any speedy trial motion that was filed in behalf of the

Defendant and that, of course, we would like an earlier trial date if at all possible." On 9 January, the prosecutor stated in writing that in view of the "possible length of the Jones case" (previously estimated by the State to be three days), the 26 February trial date should be retained to prevent interference or delay in disbarment proceedings against Frank, then set for hearing on 18 February. With respect to speedy trial, the prosecutor said that from recollections of conversations, he thought Frank was "not necessarily concerned with the trial of the Jones case but only in plea negotiations," that he would, under appropriate circumstances, "accept a stet in the case of Mr. Jones," and that his only request was that "the State Nol Pros the proceeding against Mr. Strickland. . . ."

On 10 January, Frank reminded the prosecutor in writing that he had filed a motion for speedy trial, which meant that he "would like a trial at the earliest possible date," and that the prosecutor should not concern himself about possible interference with Frank's disbarment. He pointed out that previous plea negotiations and requests for *stet* or *nol pros* had no relevance to Jones' right to speedy trial.

The two month delay from 26 December 1973 to 26 February 1974 must be attributed to the State. The prosecutor's desire not to interfere with disbarment proceedings against Frank, then set for 18 February, is not a satisfactory explanation for the choice of 26 February, in the absence of an explanation why Jones' three day trial could not have been held between 26 December 1973 and 18 February 1974. Under these circumstances the State's failure to accord Jones the earlier trial date he requested is evidence of the State's indifference and neglect with respect to his right to a speedy trial.

On 7 February, Jones refused to agree to a postponement requested by the prosecutor. The orderly processes of the law continued. On 8 February, the court removed Jones' case from the trial assignment for 26 February, stating in writing:

"Sometime ago I scheduled the above captioned

case for trial commencing on February 26, 1974, at that time anticipating that there would be no problem in making a Judge available for the trial of this case.

"However, with the trials of cases resulting from the investigation of the State's Attorney's Office, it has been necessary for us to send a Judge into Baltimore City, in exchange for the Judge from the Supreme Bench who must come out to Baltimore County, to preside at the trial of such cases. This, of course, leaves us shorthanded for the trial of cases in the regular assignment. In addition to this, at the time you made your request, Judge Walter R. Haile, who is handling the Criminal Jury assignment this term, had already scheduled cases to the end of March, so that I could not assign him to the trial of the above captioned case.

"For these reasons the above captioned case will have to be removed from the trial assignment for February 26 and rescheduled for sometime during the April Term of Court."

No new trial date was set for the April Term. No explanation was offered.

The reasons offered by the court are unsound. No attempt was made to show the status of any of the defendants in the cases assigned on the criminal jury docket and whether any such defendants had requested a speedy trial. No reason was offered why one of those cases could not have been removed from the docket so that the instant case could be tried. Even assuming that the court was shorthanded, no reason was offered why, in a judicial circuit composed of 12 trial judges, Jones' case could not be set before a judge assigned to civil cases. In short, the reasons given unequivocally added up to no more and no less than the time-honored excuse of "overcrowded dockets." [2] Any delay resulting from

---

2. Jones v. State, 241 Md. 599, 611, 217 A. 2d 367, 375 (1966).

postponement of the 26 February trial must be attributed to the State.

On 27 February, the court took action. Once again the orderly processes of the law were set into motion. Although Jones had asked to have the narcotics trial before the escape trial; had moved for speedy trial on 2 January 1973; had his 25 June 1973 State trial preempted by his federal trial; had moved for speedy trial on 14 November 1973; had vigorously asserted his desire for speedy trial in January, 1974; and had his 26 February 1974 trial aborted because of "overcrowded dockets," the court did not set a trial date. Instead, it scheduled an arraignment for 11 March 1974, at which "a firm trial date" would be set. On 1 March 1974, Frank, unable to attend the arraignment because of previous court commitments, waived his and Jones' right to be present in order to avoid delay of the trial. He emphasized that he had "been pressing for a trial date in this case for some time and would appreciate it if [he] would be notified as soon as one is set." No trial date was set. No explanation was offered.

On 22 April, the court ordered that motions be filed by 1 May and heard on 15 May. No trial date was set. No explanation was offered. The two month delay from 26 February to 22 April 1974 must be attributed to the State.

At a hearing on 15 May, the court considered a number of motions filed by Jones, many of which duplicated motions previously filed and decided, and others of which could have been filed earlier. The court, among other things, granted Jones' motion for severance and reserved ruling on his motion to dismiss for lack of speedy trial, in which he claimed substantial prejudice from the death of Kevin Darby, who allegedly would have been able to prove his innocence. A trial date of 4 June was set. No explanation for this delay was offered. On 21 May, Jones prayed a jury trial, and filed notice that there would be no stipulations. On 29 May, after a hearing, Jones' motion to dismiss for lack of speedy trial, among other things, was denied. Essentially all other pending motions were resolved. Because most of Jones' motions were duplicative or could have been filed earlier, the

resulting one and one-half month delay from 22 April to 29 May 1974 must be attributed to him.

The trial set for 4 June did not take place. No explanation was offered. By 14 June, trial was set for 26 June. The one month delay from 29 May to 26 June 1974 must be attributed to the State.

On 19 June, Frank struck his appearance. Jones was without local counsel and apparently resorted to Alch. The trial set for 26 June did not take place. Alch was ill and did not appear. He notified the court that Bailey had authorized him to enter an appearance; that Bailey would be available 18 November to defend the case; that William Carrier would enter his appearance that day as local counsel for Jones; and finally that "Jones has agreed to waive his right to a speedy trial . . . until requested date of November 18, 1974." Trial was set for 18 November. This five month delay from 26 June to 18 November 1974 must be attributed to Jones.

On 14 October, Bailey acknowledged that he once again had been retained to handle the matter, and that due to other court commitments, he was unavailable for trial on 18 November. He reiterated Jones' desire for an immediate trial, and requested a postponement of about two weeks, subject to Jones' consent. On 25 October, Jones wrote to Bailey expressing his dissatisfaction with any postponement. On 12 November, Bailey replied to Jones that: "I cannot believe that since your freedom does not at the moment hinge on the outcome of this litigation that the inconvenience of a couple of weeks is the real purpose behind your letter of October 25, 1974." On 25 October, the court wrote Bailey that:

> "The above captioned case, as you know, is scheduled for trial commencing on Monday, November 18, 1974. *Your client has been pressing for a speedy trial for sometime, and in fact has filed a written motion to that effect. Accordingly, the trial cannot be postponed without his consent in writing.*
>
> "As you were committed to this trial date

sometime ago by a member of your firm, unless Defendant consents in writing to a delay in the trial, it must proceed as scheduled." (Emphasis added.)

On 5 November, Bailey wrote Jones seeking his consent to the delay. On 11 November, Jones wrote the court that he did not want a postponement of his 18 November trial, but his letters were not received by 18 November. On 12 November, Carrier moved to strike his appearance because, among other things, there had "been little communication with Mr. Bailey concerning the case and no factual preparation for trial." His appearance was not stricken.

In the meantime, on 13 November, the court wrote Bailey that, despite the failure to secure Jones' consent, trial was reset for 2 December. Finally, on 21 November, the court, having received Jones' letter of 11 November 1974, wrote to Jones that:

"Not having heard from you previously, I assumed that you agreed to the postponement of this case to December 2."

On 21 November, Jones' *pro se* motion for speedy trial was filed. For unexplained reasons, trial did not begin until 4 December.

The two week delay between 18 November and 4 December 1974, was a flagrant example of the persistent lack of concern for Jones' constitutional right to speedy trial, which characterized this case. This delay must be attributed to the State.

On 4 December, Jones, represented by Bailey and Carrier, was brought to trial. A motion for a change of venue was granted and trial began in the Circuit Court for Calvert County on 11 December. The consequent five day delay is not attributable to the State. Jones' motion to dismiss for lack of speedy trial was immediately denied. On the second day of trial, Jones' renewed motion to dismiss for lack of speedy trial, made *pro se,* was denied. On the third day, Jones was found guilty.

Approximately two and one-half years had transpired between Jones' arrest and his trial. Six and one-half months of delay are attributable to neutral reasons, eight months are attributable to Jones and 14.5 months of delay are attributable to the State. The only reasons for the State's delay, affirmatively shown by the record, were its election to try cases other than Jones' narcotics charges, overcrowded dockets, and a total indifference to and neglect of Jones' right to speedy trial, exhibited at virtually every step of the proceeding, even after Jones, on 2 January 1973, had invoked the protection of the Constitution. Since the 14.5 month delay was not caused by sound or legitimate reasons, the State failed to meet its responsibility to bring Jones to trial.

The majority relies upon six factors, none of which alone would condone delay, but all of which together, they conclude, may permit that the delay be excused. They first point out that:

> "A substantial part of the delay related to the indictments and trials of appellant's attorneys and the State's Attorneys, part was occasioned by other trials of appellant, and part was at the behest of appellant's counsel. All of these were in large measure beneficial safeguards helping to assure appellant of obtaining a fair trial. The investigation of the prosecutors, as well as his own counsel, would provide a degree of assurance that he would be fairly tried and fairly represented. Whether or not that is what appellant wanted, it is that only to which he was entitled."

As set forth above, I agree that the one day of 11 January 1973, required for Jones' escape trial, the month from 18 June to 21 July 1973, required for Jones' federal trial, the one and one-half months between 5 April and 25 May 1973, and the five months between 26 June and 18 November 1974, set aside at the behest of Jones' counsel, are not attributable to the State.

I do not agree with the majority's assertion that Bailey's

failure to strike his appearance and his failure to notify the court that he was withdrawing Jones' waiver of his right to speedy trial, constituted, between 25 May 1973 and 26 June 1974, a "waiver" of Jones' right to speedy trial, or a "representation" that Jones did not want a speedy trial, or a "siren song luring the State to founder upon the rocks of delay."

On 5 April 1973, Bailey did waive Jones' right to speedy trial until the court was notified to the contrary. On 22 May, Jones, in the presence of Miles, discharged Bailey and Alch. Miles himself confirmed the discharge by a telephone call to Bailey's office. On 25 May 1973, in open court, Jones asserted that he had discharged Bailey and Alch, stating that he wanted Miles alone to represent him. In open court Miles confirmed the discharge. The prosecutor, then present in court, heard these assertions. The judge, also present, heard these assertions, and, without consulting Bailey and Alch further, set trial for 25 June 1973. Subsequently, Bailey himself confirmed that he had been discharged.

Between 25 May 1973 and 26 June 1974, Bailey and Alch did not participate in any activities affecting Jones. During that period all motions were filed by local counsel, all negotiations involving pleas and the setting of trial dates were conducted between the prosecutors and the court on the one hand, and local counsel on the other, without reference or consultation with Bailey and Alch. The case was set for trial on 25 June 1973, 26 February 1974 and 4 June 1974 without consultation with or notice to Bailey and Alch. The trials set for those dates were aborted without notice to or consultation with Bailey and Alch. Moreover, it was Miles, not Bailey and Alch, who represented Jones in his federal trial held between 18 June and 21 July 1973. Finally, during this entire period Jones' right to speedy trial was repeatedly asserted.

Based on this record I am persuaded that despite Bailey's failure to strike his appearance in accordance with the rules, and to notify the court that he had withdrawn his waiver of Jones' right to speedy trial, Jones, local counsel, Bailey,

Alch, the prosecutor and the court were all aware of and accepted the fact that Bailey and Alch did not represent Jones between 25 May 1973 and 26 June 1974, and that on 25 May 1973, Bailey's waiver of Jones' right to speedy trial had been revoked and terminated. In concluding that Bailey's failure to strike his appearance and withdraw his waiver of Jones' right to a speedy trial, misled the State and thereby caused or excused the delay from 25 May 1973 to 26 June 1974, the majority, despite its own admonitions, permits the sirenic lure of "legal fictions to obscure our common sense."

Nor do I agree with the majority's conclusion that, underlying a substantial part of the delay, was the "congestion and confusion" resulting from a "cloud of corruption" allegedly caused by activities of Jones' attorneys, which, in the majority's view, had to be eliminated in order to assure Jones a fair trial and fair representation. No prosecutor or trial judge ever articulated any such reason for any of the delays. Nor did the State suggest such an explanation in its brief or oral argument. Moreover, the facts do not support such a conclusion.

The majority takes a myopic view of the facts surrounding the "cloud of corruption" by limiting its inquiry to "that which is recorded for posterity in our own opinions and in those of the Court of Appeals." A more complete, and therefore more intelligible, view of the "cloud of corruption" is achieved by an examination of matters of which judicial notice may be taken, including court records in other cases, a Special Report of the Grand Jury,[3] and various items of common knowledge, derived from extensive media coverage.[4] Those sources indicate that on 25 September 1972, Frank, who had not yet entered his appearance, was indicted for an attempt to bribe Stuart E. Hirsch, then Deputy State's Attorney for Baltimore County, to procure acquittals

---

3. Special Report of the Grand Jury for Baltimore County, April Term 1973. The Daily Record (Baltimore), 14 September 1973, at 2, col. 1.

4. Indeed, some of the newspaper articles relating to these matters are attached to Jones' motion for change of venue, made 5 December 1974, and appear in the record of this case.

or probation without incarceration for Jones in his escape and narcotics cases. Frank's trial was removed to Kent County on 20 October 1972, and was held there between 29 January and 7 February 1973. At the trial, Frank admitted he paid $3,000 to Hirsch to influence his actions in matters which Frank insisted were totally unrelated to Jones. He explained that the payment was a "shakedown" with respect to a matter which had been referred by the State's Attorney for Baltimore County to the State's Attorney for Baltimore City, which might result in indictment and prosecution of Frank in the Criminal Court of Baltimore, on a charge of illegal wiretapping in connection with a murder case totally unrelated to Jones. Frank was acquitted.

On 17 May 1973, Frank appeared before the Grievance Committee of the Maryland State Bar Association, where he took the same position. On 7 June 1973, he entered his appearance in Jones' case. On 12 September, the Maryland State Bar Association instituted disciplinary proceedings in the Court of Appeals alleging that Frank attempted to bribe Hirsch in order to influence unlawfully Hirsch's actions with respect to either Jones' cases or his own possible indictment and prosecution in Baltimore City. A three judge panel of the Supreme Bench of Baltimore City took evidence on 19 February 1974, and concluded that:

> "The evidence in this matter is clear and convincing that Respondent was guilty of professional misconduct. He attempted to bribe a public prosecutor by paying said prosecutor $3,000.00 in order to influence said prosecutor unlawfully and unethically in *either* (a) the criminal indictments then pending against Jones, Everson and Pinkett wherein Respondent was either counsel or advisor to said defendants *and/or* (b) a charge against Respondent himself for a violation of Article 27, Section 125(a) of the Annotated Code of Maryland which had been referred by the State's Attorney for Baltimore County to the State's Attorney for Baltimore City

. for possible indictment and prosecution of Respondent himself." [5] (Emphasis added.)

Thus, without specifically finding that Frank had bribed Hirsch with respect to Jones' cases, the court determined that Frank's action constituted a violation of the Code of Professional Responsibility, and on 9 May, recommended Frank's disbarment. On 19 June Frank struck his appearance. On 7 October 1974, he was disbarred.

On 13 November 1972, Governor Marvin Mandel directed the Attorney General to investigate:

> "[T]he allegations of corruption of public officials in connection with the arrest pending prosecution and escape of one, John Edward Jones, from the Baltimore County jail, and to pursue any evidence of criminal violations or administrative irregularities resulting from your investigation.
>
> *"In the event your investigation of the above discloses acts or conduct in other areas which warrant further investigation, grand jury action or prosecution, you are hereby directed to pursue the same,* and you and the members of your staff designated by you shall have all of the same powers with respect thereto that have been conferred by me as to the above." (Emphasis added.)

As a result of this investigation, indictments against the State's Attorney for Baltimore County (Samuel A. Green, No. 47552, 25 October 1973,) the Chief Investigator assigned to the State's Attorney's Office (Louis Irvin, No. 47466, 12 October 1973,[6]) an attorney (Miles, No. 46921-22, 20 July 1973,) and a bondsman (Herman Kimmelman, No. 46923-26, 20 July 1973,) were returned. The charges against Green, Irvin and Kimmelman all centered around illegalities related to the expungement of an arrest record after

---

5. Maryland State Bar Association v. Frank, 272 Md. 528, 530, 531, 325 A. 2d 718, 719, 720 (1974).
6. Other indictments of Irvin were dropped before trial.

gambling charges erroneously placed against the owner of an automobile service station were dismissed. All of these charges were totally unrelated to Jones. None of them can be considered part of a "cloud of corruption" caused by Jones or his attorneys.

The only indictment related in any way to Jones or his attorneys, was the indictment on 20 July 1973 of Miles, who had represented Jones since 21 August 1972, but struck his appearance on 6 September 1973. The charges against Miles, including conspiracy with Jones to bribe- Hirsch, centered around the allegation that on 15 July 1972, he appropriated to his own use approximately $72,000 given to him by Jones' mother to "fix" or "postpone" Jones' escape trial. In effect, he was charged with failing to bribe a public official. He was tried in the Circuit Court for Baltimore County between 25 February and 11 March 1974, and was acquitted.

The Frank case and the Miles case constitute the entire "cloud of corruption" allegedly caused by Jones' attorneys, which, in turn, allegedly created the "congestion" of the court calendar, which, in turn, allegedly justified the State's delay of Jones' trial.

In light of these facts, the amount of court congestion which can be "traced back to defendant's doorstep," is insignificant. The Green trial, held from 10 January to 6 February 1974; the Irvin trial, held from 31 October to 21 November 1973; and the Kimmelman trial, held from 26 to 28 November 1973, contributed to court congestion but were not traceable to "defendant's doorstep." Frank's criminal trial was held in Kent County. His disbarment proceeding was held in Baltimore City. Frank's activities did not contribute to court congestion in Baltimore County. Miles' trial, held in Baltimore County, occupied a maximum of 15 days. A single trial of this length cannot be used as justification for a delay of 14.5 months.

In light of the cold hard facts, "the investigation of the prosecutors, as well as [Jones'] own counsel" was not necessary to "provide a degree of assurance that he would be fairly tried and fairly represented." By 7 September 1973,

the investigation authorized by the Governor was complete and the Grand Jury report was filed. No prosecutor was charged with corruption directly related to or arising from Jones' cases so that after 7 September 1973, neither investigation nor trial of the prosecutors was required.

Nor was there a need for investigation and trial of Jones' own counsel. Miles, who had been indicted on a charge which did not involve corruption of any public official, as of 6 September 1973, no longer represented Jones. There was no need thereafter to try Miles before Jones to assure that Jones would be fairly tried and fairly represented. After 7 September 1973, Frank was the only lawyer representing Jones. He had admitted giving Hirsch money for purposes unrelated to Jones' cases, had been acquitted of all charges, and was awaiting the resolution of a disbarment proceeding. Frank was then a licensed attorney who had not been suspended or disbarred.[7] He was entitled to represent Jones or any other client. Jones was entitled to a lawyer of his own choice. Therefore, the State was not required to do anything to assure Jones of a fair trial and fair representation. Indeed, to prejudice Jones' right to a speedy trial because he was represented by an attorney who might one day be disbarred for having bribed a single public official, Hirsch, who was not involved in Jones' prosecution, constitutes a substantial, unwarranted interference with Jones' right to counsel. In addition, if the State's reason for delaying Jones' trial was, in fact, to await the outcome of the disbarment proceedings against Frank, it should have at least expressly so notified him, so that he might choose other counsel and obtain a speedy trial.

---

7. At the time of Frank's disbarment, Maryland Rules BV1-10 governed disciplinary proceedings. Under Rule BV8, an attorney was authorized to practice law until the Court of Appeals determined his guilt and imposed a sanction. In February, 1975, new rules BV1-18 were promulgated, which reflect, among other things, the consideration of whether an attorney should practice law during the pendency of disbarment proceedings. Even under the new rules, which provide that an attorney convicted of a crime can be summarily suspended by the Court of Appeals, pending a disbarment proceeding, an attorney acquitted of criminal acts cannot be prohibited from practicing law until final disbarment. Maryland Rule BV16.

The record shows that such considerations were not, in fact, the reasons for the delays. Throughout the period encompassing Frank's indictment, the special investigation ordered by the Governor, Miles' indictment and acquittal, and Frank's disbarment, Jones was tried on the escape charge, and his trial on the narcotics charges was set on at least four different occasions. When it set those dates or aborted them, the State was not concerned with "clearing out the corruption contributed to by his own lawyers," nor with providing "a degree of assurance that he would be fairly tried and fairly represented."

On 11 January 1973, despite Frank's indictment and the gubernatorially directed investigation, trial on the escape charge was held. On 25 May, although disciplinary action had been instituted against Frank, trial of the narcotics case was set for 25 June. On 7 June, Frank, whose disbarment was pending, was permitted to enter his appearance. The trial scheduled for 25 June was postponed because of Jones' federal trial and not because of Frank's pending disbarment.

On 26 December 1973, the prosecutor and Frank, then the only attorney representing Jones, agreed to a tentative trial date of 26 February 1974. On 9 January, the prosecutor rejected Jones' request for an earlier trial, to avoid interference with Frank's disbarment hearing, then set for 18 February in Baltimore City. The prosecutor never did specifically state that Jones' trial was to be delayed until the matter of Frank's disbarment could be resolved. He offered no explanation as to why Jones' trial, previously estimated to require three days, could not be set between 9 January and 18 February 1974. Moreover, the authority of the three judge panel scheduled to hear the disbarment proceeding was limited to finding facts and making recommendations to the Court of Appeals, which alone has the power to impose sanctions.[8] Had the prosecutor genuinely believed it necessary to obtain a resolution of all charges relating to Jones' attorneys, to assure Jones a fair trial and fair representation, he would have insisted that Jones' trial not

---

8. Maryland Rule BV11 b5, formerly Rule BV5 b5.

be set until final resolution of Frank's disbarment proceedings, or indeed until any possible disciplinary action against Miles had been resolved.

Jones' trial, scheduled for 26 February 1974, was aborted because of overcrowded dockets, and not out of a desire to assure Jones a fair trial and fair representation. Because Miles was not charged with bribing a public official, and no longer represented Jones, there was no need to try Miles, indicted 20 July 1973, ahead of Jones, indicted 27 July 1972.

I am not persuaded that Jones' attorneys were responsible for creating a cloud of corruption, congestion and confusion, which had to be eliminated to assure Jones a fair trial and fair representation. I am persuaded that the corruption investigation and resulting trials did no more than overcrowd the dockets. I find nothing in the investigation and resulting trials which either caused or excused the State's delay.

Nor do I agree with the majority that confusion by repeated hiring and firing of counsel caused or excused any of the delay which I have attributed to the State. At all times, except for one week between 19 June and 26 June 1974, Jones was represented by local counsel so that trial could have been set at any time. Moreover, between 25 May 1973 and 4 June 1974, Jones was represented only by Miles and Frank. No delay in the setting of a trial was ever requested by them, nor was any trial ever aborted because of their unavailability. Indeed, with the exception of the delays caused by Bailey and Alch, no delay of trial was ever occasioned by the hiring and firing of counsel. I do not understand how Jones' exercise of his right to counsel, in and of itself, and without more, can be regarded as having caused or excused any portion of the delay which I have attributed to the State.

In addition, I do not agree with the majority that plea negotiations caused or excused any of the delay which I have attributed to the State. The majority relies upon two pieces of evidence to support its conclusion. The first is a motion filed by Jones alleging that a plea bargain, agreed upon at the time of his escape trial, was violated because the State

failed to drop the narcotics charges against him. The second was a letter dated 9 January 1974, in which the prosecutor charged that Frank was not concerned with the speedy trial of Jones' case but only with plea negotiations and a *nol pros* for a co-defendant. The record in fact shows that on 10 January 1974, Frank vigorously denied the prosecutor's allegations, forcefully reasserted Jones' right to a speedy trial, and pointed out that plea negotiations had no relevance whatsoever to the motion for speedy trial.

Plea negotiations are an ongoing part of every defense which often continues until the moment of trial, and sometimes beyond. Although plea negotiations can, on occasion, be used by an accused for the purposes of delay, and can, in fact, result in delay, the evidence relied on by the majority shows only that plea negotiations did occur. There is no evidence here, other than a conclusionary characterization by a prosecutor, which had been denied, that these negotiations were undertaken for purposes of delay or resulted in delay. I will not infer from the bare fact that plea negotiations were conducted, that their purpose or result was delay. The right to negotiate for a plea need not be relinquished to avoid an inference either that a delay was caused by the accused or that a delay otherwise attributable to the State should be excused.

Finally, while I believe that because Jones' motions filed in May, 1974, were duplicative and could have been filed earlier, and the one and one-half month delay from 22 April to 29 May 1974, must be attributed to Jones, I am not persuaded, as is the majority, that the resolution of other motions either caused or excused the delay which I have attributed to the State. As evidence to support their conclusion, the majority points to a motion for a change of venue in the escape trial, filed on 5 January 1973, characterized by the prosecutor as a delaying tactic; "intermittent hearings" on the "plethora of motions filed by his attorneys from time to time;" and an "avalanche of motions" made on 4 December 1974, including a successful motion for change of venue, which resulted in removal of the case to Calvert County.

226

The record shows that on 11 January 1973, only six days after the 5 January motion for change of venue, the escape trial was held. The plethora of motions, other than those for speedy trial and those which resulted in delay which I have not attributed to the State, consisted of a motion for discovery and inspection on 25 January 1974, and the only intermittent hearing not otherwise accounted for, was held on 9 April 1973 to resolve Jones' 1 December 1972 motion to suppress evidence. No explanation for the delay in deciding this motion was offered by the State. The "avalanche of motions" made on 4 December 1974, consisted of a motion for disqualification, a motion to dismiss because a prosecutor had threatened prospective witnesses, and a motion for psychiatric evaluation. The motion for disqualification was denied. The other motions were not ruled upon. In any event, trial was held on 11 December 1974, only six days after the motions were filed.

The majority presents nothing to support an inference that these motions caused or excused any significant delay which I have attributed to the State. Indeed, I am deeply distressed at the notion, implicit in the majority's opinion, that the mere filing of a motion or motions is sufficient, in and of itself, without more, to raise such an inference. I simply do not believe that an accused must forego his right to make motions to avoid such an inference.[9]

Upon the record before me, I am persuaded that the underlying reasons for the 14.5 month delay which I attribute to the State, were the State's election to try cases other than Jones' narcotics charges, overcrowded dockets, and a total indifference and neglect of Jones' right to speedy trial. So far as I am concerned, none of the six factors relied on by the majority is sufficient, standing alone, to excuse

9. The majority's reliance upon Jones' motion for change of venue, granted on 5 December 1974, which resulted in a five day delay, is particularly inappropriate. Jones' motion for a change of venue was based on allegations of pretrial publicity which identified Jones as a "narcotics kingpin," not only a week before trial, but also on the very morning of trial. The fact that it was granted, graphically illustrates that it was not made for the purpose of delaying trial but was made for the purpose of assuring a fair trial. The fact that trial was held on 11 December 1974 indicates that the motion neither caused nor excused a significant delay.

that delay. Moreover, when all of these factors are considered together, they remain insufficient to excuse that delay. Six times zero still equals zero.

## III. Assertion of the Right.

As early as 17 October 1972, Jones objected to the prosecutor's election to try the escape charge before the narcotics charges and requested that the narcotics charges be tried first. On 2 January 1973, he filed a motion for speedy trial. On 5 April, in order to obtain the services of his then attorney, Bailey, he affirmatively waived his right to a trial. On 22 May, he discharged Bailey for the sole reason that Bailey's continued unavailability was delaying the trial.

On 25 June, Jones' State trial did not take place because of his federal trial. On 14 November, Jones made another motion for speedy trial. On 7 January 1974, Frank, in confirming an agreement to a tentative trial date of 26 February, requested an earlier trial date and specifically stated that "his agreement did not waive any speedy trial motion." On 10 January, Frank vigorously denied the prosecutor's insinuation that Jones did not desire a speedy trial and forcefully reiterated that Jones wanted a speedy trial. On 7 February, Frank refused to agree to the prosecutor's request for a postponement because of Jones' desire for speedy trial. On 1 March, Jones waived his right to be present at an "arraignment" scheduled for 11 March, at which a trial date was to be set, rather than suffer the delay which might have been occasioned by the unavailability of Frank. Reiterating that he was pressing for an immediate trial, he asked to be notified of the new trial date as soon as one was set. On 15 May, Jones made a motion to dismiss for lack of speedy trial.

By 26 June, Bailey and Alch were again representing Jones. Once again, to assure representation by Bailey, Jones affirmatively waived his right to a trial for the period between 26 June and 18 November upon which date he was then scheduled to be tried. When Bailey subsequently indicated his unavailability for trial on 18 November, he requested only a brief postponement because Jones wanted a

speedy trial. The court, recognizing Jones' repeated demands for a speedy trial, refused to grant a continuance without his written consent. On 25 October and 11 November, Jones expressed his desire to forego representation by Bailey and to proceed to trial on 18 November as scheduled. On 21 November, Jones made a *pro se* motion for speedy trial.

This record shows a persistent and unequivocal pattern of conduct on the part of Jones designed to obtain a speedy trial. The only delays for which Jones was responsible came from his desire to be represented by Bailey and, indeed, on two occasions when he was required to choose between Bailey and a speedy trial, he opted for the trial in preference to Bailey. Jones' assertion of his right to a speedy trial is "entitled to strong evidentiary weight in determining whether [he] is being deprived of the right." [10]

The majority concedes that "[t]he record is replete with demands for a speedy trial and motions to dismiss for lack thereof." They assert that "[t]he only evidence contradicting those express demands is of a subtle nature." At the conclusion of their consideration of this evidence of a "subtle nature" they not only accord Jones' assertions no weight, but find, in fact, that the record "rings out the message that Jones did not want to be tried."

As part of the "subtle" evidence establishing that Jones "did not want to be tried," the majority first points to a "procession of attorneys, hired and fired at random," and to "suspicion" raised by Jones' "apparent manipulation of the legal counsel representing him."

Jones was initially represented by Bailey and Alch, Miles and Kroop. Frank, indicated on 25 September 1972, did not then represent Jones. On 11 January 1973, Jones, then represented by Bailey, was tried for escape. Miles was summonsed by both the prosecution and the defense to testify. Jones regarded his testimony as damaging. Miles struck his appearance and Murphy entered his. On 25 May 1973, Jones, having discharged Bailey and Alch for causing inordinate delay, indicated he wanted Miles to represent

---

10. Barker v. Wingo, 407 U. S. 514, 531-32, 92 S. Ct. 2182, 2192-93 (1972).

him. Murphy and Kroop struck their appearances. On 7 June, Frank, having been tried and acquitted, entered an appearance as co-counsel with Miles. Miles, indicted on 20 July 1973, struck his appearance on 6 September 1973, leaving Frank, for all practical purposes, as sole counsel. On 9 May 1974, a three judge panel recommended Frank's disbarment, and on 19 June, Frank struck his appearance. By 26 June, Bailey and Alch were again representing Jones, along with Carrier, a local attorney. These attorneys continued to represent Jones until his trial on 11 December.

The facts in this case readily explain the turnover of attorneys. I see nothing suspicious in the order in which counsel entered and struck appearances. Nor do I see any "apparent manipulation" of counsel by Jones. At all times, except for one week between 19 June and 26 June 1974, Jones was represented by local counsel, so that trial could have been set at any time. Moreover, with the exception of the delays occasioned by Bailey, due to his other commitments or the illness of his associate, matters over which Jones had no control, no delay in trial was over occasioned by the "procession of attorneys." The majority's suspicions, are, in my view, unfounded.

As further "subtle" evidence that Jones did not want to be tried, the majority relies upon his participation in plea negotiations and filing of a number of motions. I will not infer from these bare facts that Jones was not prepared and did not intend to go to trial. I do not believe that an accused must forego his right to engage in plea negotiations and make motions to avoid an inference that his insistent, formal demands for speedy trial are insincere.

"But even more compelling" evidence of Jones' desire not to be tried is found by the majority in "the correspondence from [Bailey] expressly negating demands for speedy trial." Originally, Jones' sole motivation for waiving his right to speedy trial was to assure his representation by Bailey, which he was willing to forego when the delay became inordinate. When Miles withdrew because of his indictment, and Frank withdrew because of his recommended disbarment, Jones again resorted to Bailey, and waived his

right to speedy trial to accommodate Bailey's schedule. On this occasion as well, he was willing to forego representation by Bailey when the delay became inordinate. The evidence that during two discrete periods of time, Jones waived his right to speedy trial to secure adequate representation at his trial, does not support an inference that he did not want to be tried during the 14.5 month period of delay attributable to the State.

As the final piece of evidence to establish that Jones did not want to go to trial, the majority relies on Jones' "own proclamation when he eventually came to trial that he was not yet ready for it even then." The record shows that on 11 December 1974, Jones had wanted to present evidence on his motion to dismiss for lack of speedy trial and to present several other motions supported by evidence at the beginning of his trial. A motion to dismiss for lack of speedy trial was argued. During the prosecutor's recounting of the facts, Carrier, Jones' local counsel, interrupted and requested that Jones be permitted to hear the prosecutor's proffer and be given a chance to respond. The court refused because "I am only concerned here with what the State's Attorney demonstrated from his records." Without permitting the prosecutor to conclude his summary of the facts, or Jones to present any facts, the court denied the motion to dismiss for lack of speedy trial. While Bailey had argued the motion to dismiss for lack of speedy trial, he had not called Jones to testify. Moreover, Bailey made no effort to present Jones' other motions, or to summon witnesses to testify concerning them. The relations between Bailey and Jones became strained. Carrier attempted to ease the rapidly developing friction. He failed. The conflict escalated and ended in Jones' explosive statement, set forth in the majority opinion, and his attempted discharge of Bailey. It was Jones' loss of confidence in Bailey's conduct of the trial which precipitated his unruly behavior and led to his removal from the courtroom.

In this context, Jones' statement that he was not prepared to go to trial meant only that he did not want the trial to proceed until his motions had been properly presented,

heard, and ruled upon. His discharge of Bailey was occasioned by a totally unanticipated inability to reach a *modus operandi* with him on the day of trial. Under these circumstances, I do not agree with the majority's conclusion that Jones' assertions that he was unprepared to go to trial on 11 December 1974, indicated that he had not desired and was not prepared to go to trial at any previous time.

The majority, having determined that the record here "rings out the message that Jones did not want to be tried," also concludes that the record " 'strongly suggests that [Jones] hoped to take advantage of the delay' to which his actions and the actions of his lawyers had contributed." The facts on which this conclusion rests are neither articulated by the majority nor discernible from the record. Based on this conclusion, the majority reaches for "the *Barker* result," which it offers as a solution. I find *Barker* to be totally inapplicable to the facts of this case.

In *Barker v. Wingo*,[11] the accused and his co-defendant, Manning, were both indicted on a charge of homicide. The State had a stronger case against Manning than it did against the accused and believed that the accused could not be convicted unless the co-defendant testified against him. In order to conclude Manning's trial before trying Barker, thereby removing the barrier of Manning's unwillingness to incriminate himself, the State sought a series of continuances. On 11 occasions between 21 October 1958 and 12 February 1962, Barker agreed to the continuances sought by the State. During that period, no action whatever was taken that could be construed as the assertion of a speedy trial right. On 12 February 1962, Barker made a motion to dismiss for lack of speedy trial. The ground for the motion was not stated and no alternative motion for speedy trial was made. At oral argument counsel conceded that Barker definitely did not want to be tried, and that Barker was gambling on Manning's acquittal, because he thought that since the evidence was not very strong against Manning, if Manning were acquitted, he would never be tried. The

---

11. 407 U. S. 514, 92 S. Ct. 2182 (1972).

conclusion that Barker was gambling on Manning's acquittal was also supported by his failure, following his *pro forma* motion to dismiss filed in February, 1962, to object to the Commonwealth's next two motions for continuance. In addition, it was not until March of 1963, after Manning's conviction was final, that Barker, having lost his gamble, began to object to further continuances. Finally, there was no serious prejudice. Indeed, there was not even a claim that any of Barker's witnesses were dead or unavailable at the time of trial. On these facts the court found that Barker was not deprived of his right to a speedy trial, despite a five year delay between his arrest and trial.

In the instant case, Jones never agreed to a postponement proposed by the State. He objected to delays and repeatedly asserted his desire for a speedy trial. There is no evidence that he was gambling on the acquittal of co-defendants. There is no evidence here that he did not want to be tried. Finally, as will be set forth below, there is evidence of actual prejudice of a substantial nature, in that Jones' major alibi witness, Kevin Darby, had died in the interim. Under these circumstances, *Barker v. Wingo* is inapplicable to the instant case.

## IV. Prejudice.

In *Epps v. State*,[12] the Court of Appeals considered the question of prejudice from a delay which creates an impairment of an accused's defense. There the court pointed out that as a result of a delay attributable to the State, a witness who had been in attendance on 28 December 1972 when the case originally came to trial, who was then "apparently prepared to testify that the appellant was not at the scene of the robbery," was inducted into the Armed Forces and was serving in Korea at the time of the trial.

At the trial, there was evidence to show that the victim was robbed at about 2 a.m., on 9 August 1972, by three men, one of whom carried a knife and another a stick. Immediately following the incident, the victim ran down the

---

12. 276 Md. 96.

street. He encountered a policeman to whom he reported the robbery. Cruising with the officer in a police car, the victim, within a brief interval, observed the trio, one of whom was carrying a radio, and another a stick. When the police officer ordered them to "halt," one of the group took flight. The victim was unable to identify the accused as his assailant. Another witness, however, identified the accused as the fugitive.

The accused elected not to testify. Thus, the missing witness would have been the only witness in the accused's behalf. The Court of Appeals said:

> "Although admittedly speculative, the testimony of David Epps might have been sufficient to have generated a 'reasonable doubt' as to his guilt.
>
> "For all practical purposes, any possible defense which the appellant had was obliterated when by reason of the postponement on December 28th he was denied the opportunity of presenting the testimony of his alibi witness. It seems to us that the appellant has demonstrated not only 'the possibility that [his] defense will be impaired,' but has shown, to his prejudice, an actual impairment of his defense." (Citations omitted.)

Here Jones was ultimately tried on four counts of a nine count indictment.[13] At the trial, a police officer testified that on 12 July 1972, at about 5:25 a.m., the police, armed with a valid search warrant, entered a semi-detached home, located at 3703 Trent Road, owned by Jones and his then girlfriend, co-defendant Brenda Lou Pinkett, in which Pinkett lived and which Jones visited on occasion. Substantial quantities of heroin and narcotics paraphernalia were found. Some items were hidden in various places throughout the house. Some were found in "bedrooms." Strainers were found in the

---

13. These four counts charged that on 12 July 1972, Jones unlawfully possessed heroin; unlawfully possessed heroin with intent to distribute; and unlawfully possessed controlled paraphernalia of two different kinds, with intent to use such items for the illegal distribution of heroin.

kitchen sink. Confectioner's sugar and two packages of Scotch tape, as well as some plastic bags, were found "in the kitchen." At the time of the search, co-defendant Pinkett was present on the premises. Jones was not.

While there was evidence to show that Jones had engaged in narcotics transactions before 12 July 1972, only three witnesses gave testimony which tended to link Jones to the Trent Road premises, and to show that he was in joint possession of the narcotics and paraphernalia found there on 12 July. A police officer said that on 23 May 1972, he saw Jones enter those premises and heard him say to an accompanying male: "Hurry up with that stuff, I want to have it whacked up before daylight." Jessie Parker, a felon with a record of convictions for narcotics related offenses as well as grand larceny, assault and manslaughter, testified that about 7:30 p.m. on 11 July 1972, at the Trent Road house, Jones exchanged narcotics with him for $6,700 in small bills.[14] Finally, another police officer testified that at about 4:20 a.m. on 12 July 1972, he saw Jones, co-defendant Pinkett and an unidentified male come out to the front porch of that residence. Through starlight binoculars, which he felt it necessary to use because he "had never come in contact with Miss Pinkett or Mr. Jones and I had no idea who they were," he saw Jones, carrying a brown paper grocery bag, get into a car and drive off. The police officer "hit the high beams on [his] vehicle to get a good view of the operator." He followed Jones to 18 Kitridge Court, a single family dwelling owned by Jones' brother. After seeing Jones enter the residence, the police officer drove to a location about four or five miles away, waited approximately 30 minutes, returned to 18 Kitridge Court at about 5:25 a.m., where he joined several other police officers armed with a valid search warrant, who forcibly entered the premises. Jones was arrested. Two other unidentified men were then present in the house. No narcotics were found.

---

14. A later witness, William W. Carrier, co-counsel for Jones, impeached Parker's testimony by testifying to prior inconsistent statements made by Parker and by specifically testifying that on 11 June 1974, Parker told him that he would testify that he had never engaged in a narcotics transaction with Jones.

At his trial, Jones proffered, with respect to his motion for speedy trial, that co-defendant Kevin Darby, who bore a strong physical resemblance to him,[15] would have testified that he, Darby, and not Jones was at 3703 Trent Road at 4:20 a.m. on 12 July 1972, and that it was he, not Jones, who was observed by the police officer leaving that address and driving to 18 Kitridge Court. This alibi witness was killed in May, 1973.[16] Jones also proffered that another alibi witness, one Joseph Perry, was killed in 1973. Bailey proffered that co-defendant Andrew Strickland, whom Jones had planned to call as a witness in his behalf, had disappeared.

At trial, Jones elected not to testify in his own behalf. No alibi witness did, in fact, appear. The evidence presented to establish Jones' dominion and control over the heroin and narcotics paraphernalia found at 3703 Trent Road on 12 July 1972 was exceedingly thin.[17] Although admittedly speculative, the testimony of alibi witnesses might have been sufficient to generate a reasonable doubt as to Jones' guilt. Thus, for all practical purposes, here, as in *Epps*, Jones' only possible defense was obliterated by the State's delay, particularly by its election to try the escape charge first and its concomitant failure to set a trial between 15 December 1972, when the case was ready, and 5 April 1973.

I disagree with the majority's analysis that even assuming Jones had shown actual prejudice, the majority would not consider the factor of prejudice because the delay was not "the fault of the State." Based upon the record before me, I am convinced that Jones has shown, to his prejudice, an actual impairment of his defense which must be taken into

---

**15.** To show the resemblance, Jones described the *modus operandi* of his escape in July of 1972. He stated that Kevin Darby, a/k/a Kevin Jones, was also arrested on 12 July 1972 and taken to the Baltimore County jail. Bail was set and posted for Darby/Jones. When the institution personnel called the name "Jones," appellant presented himself and was released in place of Darby/Jones.

**16.** Jones' proffer in this respect was corroborated by the fact that in open court on 25 May 1973, the prosecutor informed the judge that he had learned that Darby had recently been killed. The indictment of Darby was abated by death on 22 October 1974.

**17.** *See* Garrison v. State, 272 Md. 123, 321 A.2d 767 (1974).

account as a factor in determining whether he was denied a speedy trial.[18]

## V. Conclusion.

I agree with the majority that because the remedy of dismissal is so severe "we must be especially careful not to permit legal fictions to obscure our common sense." I also believe that an overzealous concern that whenever a court incorrectly finds a denial of the right to a speedy trial, "a criminal fairly convicted on abundant evidence . . . will be freed," should not blind us to the elemental truth that our judicial process requires that legal questions, particularly constitutional questions, be determined only on facts which can be articulated and discerned, and upon the legitimate inferences adduced therefrom. This requirement is not met in the majority opinion.

The process used by the majority involves first, finding that the facts in the record were inadequate; then supplementing the record with another set of facts arbitrarily limited to those in "our own opinions and in those of the Court of Appeals;" then supplementing the inadequacy of those facts by impermissible inferences; and then failing to make requisite assessments with respect to the length of delay attributable to the State and to Jones, and with respect to prejudice to Jones' defense. On these deficient premises, the majority determines an individual's constitutional rights. I cannot join with my brothers in such a process.

The issue in this case is simple and uncomplicated. The State had the obligation to bring Jones to trial. The facts and inferences legitimately deducible are insufficient to show that the State has met this obligation. Instead, those facts and inferences show that the trial of Jones, who had repeatedly asserted his right to a speedy trial, was delayed for a period of 14.5 months because of the State's election to try cases other than Jones' narcotics charges, the existence of overcrowded dockets, and a total indifference to his

---

18. Epps, *supra*, at 26.

asserted right to speedy trial. This 14.5 month delay, which was not caused by sound or legitimate reasons, resulted in actual prejudice to Jones.

John Edward Jones was not convicted on "abundant evidence." Because of the prejudice he suffered as a result of the inordinate delay caused by the State, he was not fairly convicted. He is entitled to be freed. Jones' motion to dismiss should have been granted. Accordingly, I would reverse the judgment of the court below. In view of this result, I would reach no other question.