# LUKE JAMES *v.* STATE OF MARYLAND

[No. 689, September Term, 1975.]

*Decided June 8, 1976.*

The cause was argued before THOMPSON, DAVIDSON and MOORE, JJ.

*Dennis M. Henderson, Assistant Public Defender*, with whom were *Alan H. Murrell, Public Defender* and *George E. Burns, Jr., Assistant Public Defender*, on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City* and *Domenic Iamele, Assistant State's Attorney for Baltimore City*, on the brief, for appellee.

Moore, J., delivered the opinion of the Court.

The fatal shooting of a 22 year old Baltimore City policeman on April 5, 1974 gives rise to this appeal. Appellant, who relied for his defense upon a theory of alcoholic blackout or amnesia,[1] was found guilty of first degree murder in the death of Officer Frank Whitby and of assault with intent to murder Officers William Nowakowski and Carl Grinnage. He was sentenced to life imprisonment for murder, 15 and 10 year consecutive sentences on the assault charges, to be served consecutively to the life term and two 5 year concurrent sentences for handgun convictions, to be served concurrently with the other sentences.

Appellant assails his convictions upon the grounds of alleged insufficiency of the evidence, alleged error in denying his motions for a mistrial based upon remarks by the prosecutor claimed to have been inflammatory, alleged error in the admission of evidence of a prior conviction and alleged failure of the trial court properly to consider the issue of whether his claimed amnesia precluded a fair trial.

After careful consideration of the record in this case, including some 1000 pages of transcript and numerous exhibits, we conclude that the assignments of error are not supported and that the judgments of conviction must be affirmed.

The senseless shooting of Officer Whitby occurred on Saturday, April 6, 1974, at approximately 1:00 p.m. Appellant, then 43 years of age, had apparently spent a substantial part of the previous day drinking. Witnesses for

---

1. This was the second criminal trial of the appellant. The first trial resulted in a mistrial on October 1, 1974, for reasons not disclosed in the record. The trial resulting in this appeal began on February 10, 1975. Appellant, by appropriate plea to the indictments, raised the issue of his competency at the time of the alleged offense and at the time of trial. Prior to the first trial, Ross, J., presiding, the court ruled that appellant had not overcome the presumption of sanity, that he was competent to stand trial and that the issue of intoxication would be for the jury's consideration upon appropriate instructions. He also ruled, as noted later in the opinion, that the court could not, in advance of trial, determine whether or not the appellant's claimed amnesia was such as to preclude a fair trial. At the outset of the second trial, Thomas, J., presiding, appellant moved for a rehearing on these issues but the motion was denied and the trial court adhered to the rulings previously made by Judge Ross.

the defense testified that appellant and his girlfriend, Lagertha Buise, arrived at the home of her mother and stepfather on East Oliver Street at 9:30 or 10:00 p.m. The girlfriend's uncle was also present. The group began playing pinochle, imbibing beer and liquor as they played. The quantity of drinks available to them and consumed by the appellant was variously estimated by the witnesses — the girlfriend stating with apparent exaggeration that appellant consumed as much as two gallons by the time the card game terminated at 8:30 or 9:00 the following morning. At that juncture appellant and Lagertha Buise left her mother's home, destined for the home of appellant's sister. In response to a question on direct examination as to his condition at that time, appellant testified:

"I was pretty high. I was high but wasn't what you call sure enough drunk. I wobbled a little bit."

Not finding the sister at home, they located her at the house of a friend and went with her to a local bar at the corner of Wolfe and Lanvale Streets. There, the trio consumed beers and a pint of whiskey.

At approximately 1:00 p.m., one Barnard Smith, who was having his automobile washed in the neighborhood, entered a public telephone booth on the street outside the tavern to telephone his wife. As he did so, he observed appellant walking unaccompanied down East Lanvale Street shooting a pistol at random. One of the bullets came dangerously close to the telephone booth. Mr. Smith crouched on the floor and dialed the police. When the officers arrived on the scene, Mr. Smith informed them that appellant had entered a rowhouse, 1911 East Lanvale (later established to be the residence of his sister). Policemen were deployed to the front and rear of the house and Officers Whitby, Nowakowski and Grinnage ascended the front steps. Whitby was first in line. In response to his knock, appellant's sister appeared at the door. She stated that there was no one in the house with a pistol — the only other occupant being her brother and that he had no gun. As she motioned the officers inside, Officer Whitby, armed with a shotgun, entered the vestibule and

proceeded to the hallway of the house. As he did so, three shots rang out. He turned to his companions and stated, "I have been shot," and fell to the floor. He then crawled back toward the outside door. He was assisted from the house by Officer Grinnage and placed in an alley a few doors away, awaiting the momentary arrival of an ambulance.

Officer Nowakowski took a position outside, to the left of the front steps, and testified that he presently found himself looking down the barrel of a revolver in appellant's hand. He fired three shots but appellant withdrew into the house, unscathed.

Thereafter the police established a barricade in the front and rear of the premises. The supervising officer, using a "bullhorn" and having learned appellant's name, called out to him to surrender. After some 40 minutes appellant shouted that he was coming out and giving himself up. Heeding the instructions of the supervising officer, he emerged with his hands up, descended the front steps and spread his arms on the hood of an automobile. He was quickly handcuffed and searched and then transported from the scene. One of the police officers, Paul A. Ayres, testified that appellant stated at the time of his apprehension that he did not know that the man he shot was a police officer.[2]

Officer Whitby was taken to Johns Hopkins Hospital where he underwent 7 or 8 major surgical procedures. He died there on May 5, 1974, the cause of death being extensive bronchial pneumonia, complicated by multiple gunshot woulds of his leg and abdomen.

The trial in this case commenced on February 10, 1975 and ended on February 20th. Appellant took the stand in his own behalf and testified that he had no recollection of events which transpired after drinking at the bar on Saturday morning until his apprehension by the police. He did remember walking from the home of his girl-friend's mother on East Oliver Street to East Lanvale and also recalled going

---

2. The officer's testimony was first received at a hearing on voluntariness out of the presence of the jury. The court ruled that it was voluntary.

to and being at the local bar. He also admitted the possession of two revolvers and stated that he found them in a car at a garage where he was temporarily employed and had them in his custody at the time of his arrest because he intended to sell them.

## II

We address ourselves to appellant's contentions in the order in which they have been presented:

a. *Sufficiency of Evidence — First Degree Murder*

In the instant appeal, the *corpus delicti* of homicide was amply demonstrated, as was the criminal agency of appellant, in the perpetration of the homicide. On his behalf it is contended, however, that in the absence of any confrontation between victim and assailant, there being no testimony of any exchange of words before the shots were fired, that the State did not prove, as it must, that the homicide was "wilful, deliberate and premeditated" so as to constitute murder in the first degree. Maryland Code (1957, 1976 Repl. Vol.) Art. 27, § 407; *Chisley v. State*, 202 Md. 87, 95 A. 2d 577 (1953); *Wilson v. State*, 261 Md. 551, 276 A. 2d 214 (1971); *Gladden v. State*, 273 Md. 383, 330 A. 2d 176 (1974).

As Judge O'Donnell stated for the Court in *Gladden, supra:*

> "For a homicide to be 'wilful' there must be specific purpose and design to kill; to be 'deliberate' there must be a full and conscious knowledge of the purpose to kill; and to be 'premeditated' the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate."

Citing *Chisley, supra,* the Court in *Gladden* pointed out that to sustain a conviction of murder in the first degree, as defined in Maryland, the jury must find:

> " 'the actual intent, the fully formed purpose to kill,

with so much time for deliberation and premeditation as to convince them, that this purpose is not the immediate offspring of rashness and impetuous temper and that the mind has become fully conscious of its own design.' It is not necessary that deliberation and premeditation shall have been conceived or have existed for any particular length of time before the killing. *Their existence must be judged from the facts of the case.* . . ." 273 Md. at 387.

And in *Gladden,* the Court also cited *Wilson, supra,* for the proposition that:

"If the killing stems from a 'choice made as a result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder.' "

And as Judge Moylan pointed out for this Court in *Evans v. State,* 28 Md. App. 640, 349 A. 2d 300 (1975), in proving wilfulness, deliberation and premeditation beyond a reasonable doubt, the State will not have relied upon a mere presumption of malice but will of necessity have proved the element of malice, meaning "an intentional killing absent the mitigating circumstances of a hot-blooded response to a legally adequate provocation."

In the present case it is significant that the shooting by the appellant of Officer Whitby was in no way provoked by any action of the decedent or of his two companions. The autopsy indicated that the victim suffered gunshot wounds to the right lower abdomen, right thigh and right leg. (The bullet to the abdomen perforated the major vascular structure of the lower abdomen, penetrated the diaphragm and ultimately became lodged in the left lung.)

Premeditation and deliberation, being subjective in nature, can be established from the circumstances surrounding the particular case. 40 Am.Jur.2d *Homicide* § 263; 1 Wharton, *Criminal Evidence* § 135 (13th ed. 1972). As

the trial court observed in this case when he denied appellant's motion for judgment of acquittal at the close of the case:

> "The question of premeditation has to be determined by the facts of each case. In this case, I think the triers of the fact, the jury, may well draw the inference the Defendant was in the hallway or the area of the hallway, heard the conversation between the stout woman and the police, knew the police were going to talk to him, approach him or apprehend him, and as the police approached he stepped forward to a doorway and fired three shots fatally wounding Officer Whitby."

The circumstances above related by the trial court, as well as the appellant's subsequent statement that he did not know the person he shot was a policeman, combined with the number of shots fired, add support to a permissible inference of premeditation and deliberation. *Chisley v. State, supra; Wilson v. State, supra; Cummings v. State*, 223 Md. 606, 165 A. 2d 886 (1960). We must reject appellant's contention that:

> "In the absence of any facts which would supply a reasonable foundation for an inference of deliberation and premeditation, the jury was left to reach its determination through speculation and conjecture."

b. *Sufficiency of the Evidence — Assault with Intent to Murder*

The appellant was convicted of assault with intent to murder Officer Grinnage and of assault with intent to murder Officer Nowakowski. It is our conclusion, contrary to the contentions of appellant, that there was legally sufficient evidence from which the jury could find Luke James guilty of these offenses beyond a reasonable doubt. The trial court effectively summarized the evidence when he

674

stated, in ruling against appellant's motion for judgment of acquittal:

> "With respect to the two indictments, assault with intent to murder, I think there is sufficient evidence to go to the jury on these. Shots were fired in the direction of all three officers. One was in back of the other, plus the testimony of Officer Nowakowski, which would be a separate situation entirely. The motion will be denied."

Assault with intent to murder is a statutory offense. Md. Code (1957, 1976 Repl. Vol.) Art. 27, § 12. The essential element of the crime is an assault made with intent to murder, that is, if death had ensued, the killing would have constituted murder. A specific intent to murder is not necessary to sustain a conviction, it being sufficient if there was an intention to commit grievous bodily harm. *Webb v. State*, 201 Md. 158, 93 A. 2d 80 (1952); *Bird v. State*, 231 Md. 432, 190 A. 2d 804 (1963). The intent to kill is inferable from the use of a deadly weapon directed toward a vital part of the body. *Bird v. State, supra.*

The testimony of Officer Nowakowski, to which the trial court referred above, related to the developments which rapidly occurred after the initial gunfire inside the house when Officer Whitby was fatally wounded. Officers Nowakowski and Grinnage exited the building and Nowakowski, as previously stated, took up a position near the doorway. Looking up, he saw the appellant:

> "A. I then looked, like, just laid my body up against the wall on the pavement at that time and I was looking at the house and Mr. Luke James, he was standing there in the same doorway where I first seen him and he was holding the gun.
>
> Q. Who was?
>
> A. That man, holding a gun.
>
> Q. Were you able to see the gun?
>
> A. I was looking right down the barrel.
>
> Q. What did you do then?

A. I just leaned on — I was leaning over the steps at that time and I had my service revolver at that time and extended my arm out and laid it against the legs of that fat lady, the heavy-set woman. She was still standing in the vestibule. I laid my arm against her legs and fired three shots.

\* \* \*

"A. I came over here and I wanted to peek in, see what was happening and I didn't have any idea when I pulled my gun. Sometime I did pull my hammer after I went down the steps. I looked around and Officer Whitby was in the vestibule. Guess it must have been about this time. The heavy-set woman was standing right here, almost to the frame of this, in this door. And, I looked and I seen that man over there and his gun was pointing at me at that time, I fired three shots."

From this testimony the trier of fact could have found that appellant pointed a deadly weapon at a vital part of Officer Nowakowski's body and would have shot Officer Nowakowski had the policemen not fired first at the appellant, forcing him to retreat into the house.

With respect to the assault upon Officer Grinnage, the evidence is also sufficient to sustain appellant's conviction. Officer Grinnage was directly behind Officer Whitby as the trio entered the vestibule and proceeded into the hallway. Officer Grinnage testified that, "*We* were fired upon from the right side of the house." (Emphasis added.) Because of the close proximity between Whitby and Grinnage when appellant fired the shots, there was a permissible inference that appellant was pointing a gun at all three of the officers and attempting to shoot Officer Grinnage as well as the other two; and that appellant's failure to do so was attributable to the instinctive reaction of Grinnage in taking flight to avoid being killed or wounded.

Appellant has failed to show that there was no legally sufficient evidence or inferences therefrom from which the

jury could find him guilty of both charges of assault with intent to murder beyond a reasonable doubt. Without such a showing a judgment entered on the verdict of the jury may not be overturned on grounds of insufficiency. *Culver v. State*, 1 Md. App. 406, 230 A. 2d 361 (1967); *Johnson v. State*, 9 Md. App. 166, 263 A. 2d 232 (1970).

### c. *Alleged Inflammatory Comments of Prosecutor*

At the outset of this somewhat protracted trial, the court delivered a carefully phrased instruction to the jury. This took place prior to opening statements and before any testimony was received. The court enunciated the proposition, *inter alia,* that the statements of counsel during opening and closing arguments are not evidence and that the jury was to decide the ultimate issues based upon the testimony and exhibits, the court's instructions themselves being advisory.

Twice during the course of the opening statement, once during his closing argument and once in his rebuttal, the prosecutor made statements which appellant claims were inflammatory and he contends that a mistrial should have been granted.

In his opening statement, after relating what the facts would show with respect to the shooting of Officer Whitby, the prosecutor declared:

"The saga doesn't end here. It goes on because an ambulance responded and quickly left and Officer Whitby was transported to Johns Hopkins Hospital. He was taken in the greatest haste possible to the operating room where he was placed directly on the operating table. Certain tests were conducted and it was the conclusion of the medical people there that he was losing gross amounts of blood, so an incision was made in his upper left chest right over here and an incision was made in his belly right over here. The first incision was for the purpose of tying off the aorta, one of the major blood vessels. They clamped that off, the reason being he was bleeding

from the wounds he sustained, that being in the abdominal area. They then did an exploratory laparotomy. They cut him open to find out what was wrong and they found out what was wrong, that a bullet pierced him and in doing so, pierced what is known as iliac, the major blood vessel that goes to the leg, and he was losing tremendous amounts of blood. It also pierced his bowels so that his own fecal matter was spilling into his abdomen.

"MR. HARRIS [Defense Counsel]: Objection. May we approach the bench?"

An unrecorded conference was held at the bench out of the hearing of the jury. (The following day at a conference in chambers, counsel for appellant stated — and the court concurred — that the record should show that a mistrial was requested during the unrecorded bench conference and that the court denied the motion.) The prosecutor thereupon resumed his statement and continued in similar vein:

"MR. IAMELE [for the State]: Ladies and gentlemen, this was on April 6th that Officer Whitby was admitted. These operations were performed on April 6th. After that there were approximately four or five more operations that were performed on him because the hospital, the doctors, could not control the bleeding in his abdomen. In fact, one hundred and fifty units of blood, fifteen times the amount of blood each of us has, was given to him during the course of his treatment. Officer Whitby when he went on that operating table April 6th 1974, did not have a pulse, he was not breathing. His life was sustained through the miracle of medicine. His condition, as bad as it was, grew progressively worse during the next month. As I said, he had about five more operations after that, all to his abdomen. His kidneys shut down and he was put on a kidney dialysis machine."

At that point defense counsel again objected and the following took place at the bench out of the hearing of the jury:

> "MR. HARRIS: I make the same objection I made a moment ago. I believe the State's Attorney is overdramatizing in his opening statement and the only purpose is to inflame the jury and raise prejudice to the Defendant.
>
> "THE COURT: I would just caution Mr. Iamele not to overdramatize the situation and proceed with what you expect to prove without going into details of the officer's suffering.
>
> "MR. IAMELE: Very well."

In his closing argument, ten days later, the Assistant State's Attorney made reference to the surgical procedures to which Officer Whitby had been subjected in the month following the shooting. The prosecutor again referred to Officer Whitby's suffering:

> "After this, ladies and gentlemen, you heard the testimony of Dr. Whitaker. He testified, he told you what horrible suffering that must have gone on for the month after that. He told you that Officer Whitby was admitted to the hospital, that he had approximately seven operations in that month. He told you his blood was replaced between fourteen times over or seventeen times over. He told you of his agony for a month."

The defense interposed an objection and the following colloquy took place at the bench:

> "MR. HARRIS: I don't believe the doctor testified to the agony. Again, this man is not on trial for what happened in the twenty-nine days. He is charged with homicide of Officer Whitby. I believe I made this objection in opening statement and at the time the hospital records were tried to be gotten into evidence. What happened in the hospital

has nothing to do with the case, and I move for a mistrial.

"THE COURT: The motion for mistrial is denied. Up to this point, I don't think it has been so dramatized that it would require granting the motion. Further, I think it may fall within the general pattern of argument. However, having said that, I would caution the State not to pursue this further.

"MR. HARRIS: Thank you."

Finally, in his rebuttal argument, the prosecutor remarked:

"Mr. Harris talks about the fact the .25 caliber is puny, is a slingshot. Matter of fact, a .25 caliber at close range is more devastating than a .38. A .38 highpower goes through a person. But a .25 goes helter skelter through the body itself, the kind of agonizing death Officer Whitby suffered."

Defense counsel made an objection and the court responded:

"I think it's argument." [3]

First, we observe that the prosecutor's language in opening statement wherein he indulged in a vivid and irrelevant description of the unfortunate victim's wounds, was improper. Also objectionable were the prosecutor's references to the "horrible suffering" and "agony for a month" in his closing statement but we are inclined to agree with the trial court's ruling, above quoted, that the subject had not been so "dramatized that it would require granting the [mistrial] motion." With respect to the statements of the prosecutor made in rebuttal, we think the trial court was correct in characterizing his remarks as "argument"

---

**3.** At the conclusion of the State's rebuttal at a conference at the bench out of hearing of the jury, defense counsel recorded an objection to the comments of the prosecutor concerning appellant's inability to recall specific events and moved for a mistrial. He did not, however, also cite the above quoted remarks in support of his motion.

inasmuch as defense counsel had himself attempted to minimize the effect of a .25 caliber weapon, having called it "puny" and a "slingshot."

In this factual context it is our conclusion that the trial court should have issued a cautionary instruction to the jury after the first of the prosecution's statements — even though it had not been requested — and made it plain to the Assistant State's Attorney that a repetition would not be tolerated. As indicated, we find of lesser objectionable impact the remarks made in the State's closing statement and in its rebuttal argument — a closing statement and rebuttal argument which took place some ten days after the opening statement.

While we thus hold that it would have been better practice for the trial court to have acted *sua sponte*, in the manner suggested, we find ourselves unable to concur with appellant that there was prosecutorial misconduct such as to justify the granting of a mistrial.[4] It is fundamental law that a request for a mistrial in a criminal case is addressed to the sound discretion of the presiding judge and the action of the court is reviewable on appeal for purposes of determining whether the denial of the mistrial constituted an abuse of discretion. In the leading Maryland case on this subject, *Wilhelm v. State*, 272 Md. 404, 326 A. 2d 707 (1974), the Court of Appeals made it plain that the action of a trial court, in the exercise of its discretion denying a mistrial, is not reversible "unless it is clear that there has been prejudice to the defendant." 272 Md. at 429. The Court there also cited with approval the language of the Court in *Cornish v. State*, 272 Md. 312, 322 A. 2d 880 (1974), that the trial court in the exercise of its discretion should declare a mistrial only where there is "manifest necessity for the act." The Court in *Wilhelm* characterized as in accord with Maryland authority the distillation of Illinois law on this subject as set forth in *People v. Mackins*, 17 Ill. App. 3d 24,

---

4. As the transcript, above quoted, reveals, there were two such motions. One was made after the first series of objectionable remarks in opening statement. The second motion was made after the State's comments in closing argument. Only the first appears to have a substantial basis.

308 N.E.2d 92 (1974). There the following propositions were delineated:

1) The trial court has a superior opportunity to determine [5] the propriety of final argument.

2) It is impractical to lay definite guidelines for what may and may not be said in arguments to a jury.

3) The mere occurrence of improper remarks does not by itself constitute reversible error.

4) An appellate court must necessarily conclude that no prejudicial error resulted from the argument, if it cannot be said that the assailed argument

   (a) constituted a material factor in the conviction;

   (b) must have resulted in substantial prejudice to the accused; or

   (c) that the verdict would have been different had the improper closing argument not been made.

As a reviewing Court and finding as we have that the impropriety of the prosecutor's remarks pertained principally to an opening statement made ten days prior to the deliberations by the jury we are unable to conclude that the argument to which appellant objected was a material factor in his conviction or resulted in substantial prejudice to him. The evidence of appellant's involvement in the homicide of Officer Whitby was overwhelming. *Compare, Berger v. United States*, 295 U. S. 78 (1935) where the Court recognized as a standard that the less compelling the

---

5. In *Wilhelm*, Judge O'Donnell wrote for the Court of Appeals, 272 Md. at 429:

"In considering whether, in the first instance, any of the remarks attributed to the prosecutor had the effect of unfairly creating prejudice against the defendant, recognition must be given to the fact that the trial judge, who presides in the arena where the forensic adversaries are engaged, is in the best position to evaluate and assess — in the context in which the remarks are made and their relationship to other factors in the trial — whether they were in fact prejudicial."

evidence of guilt the more readily a case should be reversed for prosecutorial misconduct. And *see, Wilhelm, supra,* where the Court described as an important and significant factor whether or not the judgment of conviction was "substantially swayed by the error or the evidence of defendant's guilt was overwhelming." 272 Md. at 427.

Furthermore, the trial court here was careful to advise the jury in its *final* instructions that Officer Whitby's pain was not a factor. Judge Thomas explained:

"In weighing the testimony and arriving at your verdict, you are not to be influenced by questions of public interest or policy, or the effect of your verdict upon other persons charged with crime, *or any suffering of the victim.* Your verdict should be based upon the evidence or lack of it and nothing else." (Emphasis added.)

d. *Alleged Error in Admitting Evidence of Appellant's Criminal Record*

Appellant took the stand in his own defense. Over objection, the Assistant State's Attorney elicited on cross-examination that appellant was on parole and, over objection, he was also permitted to establish the fact that one of the conditions of his parole was that appellant not "own or possess, use or sell any dangerous weapon or firearms without approval of the Parole Board." The Court then permitted, over objection, the introduction into evidence of the Order For Release On Parole executed by the Chairman of the Board of Parole on April 18, 1972. The Order showed not only the conditions of parole but also that appellant had been convicted of the crime of robbery with a deadly weapon in the Criminal Court of Baltimore on April 3, 1963.

Appellant does not argue the point that cross-examination with respect to his status as a parolee and the conditions of his parole was improper.[6] Rather, it is contended that the

---

6. "Inquiry into the 'length of time served and conditions or circumstances surrounding the parole of a defendant' is improper." People v. Smith, 48 Cal. Rptr. 382, 390 (Cal. S. Ct. 1966).

*Burgett* principle (*Burgett v. Texas*, 389 U. S. 109 (1967) was violated in that the Parole Order recited a prior conviction but it was not established that the conviction and subsequent parole resulted from a trial at which appellant was represented by counsel or had knowingly and voluntarily waived such representation.

Although without the benefit of the majority opinion of this Court in *von Lusch v. State*, 31 Md. App. 271, 356 A. 2d 277 (1976), the State argues that appellant's objection did not present to the trial court nor preserve for appeal the question of a violation of the *Burgett* principle. We do not see it that way, even in the light of *von Lusch*. When the Parole Order was initially marked as a State exhibit, defense counsel immediately objected and the following took place at the bench out of the hearing of the jury:

> "MR. HARRIS: It has been established that by the question he was on parole. I assume for possible relevancy, this form the State's Attorney is intending to produce . . .
>
> "MR. IAMELE: This is the thrust of my case. This merely lays the foundation for the fact one of the conditions of parole as indicated in a signed document Your Honor has in your hand now, shows the parolee shall not possess, use or carry firearms in the State of Maryland while he is on parole.
>
> "THE COURT: I'll overrule the objection.
>
> (The proceedings at the bench were terminated.)
>
> "THE COURT: The objection is overruled."

Subsequently, the State established, over objection, that the Parole Order had been signed by the appellant and it was introduced:

> "MR. IAMELE: I offer this as State's exhibit no. 17 and ask the jury be allowed to see it.
>
> "THE COURT: The basis of the objection is not authenticity?
>
> "MR. HARRIS: The same as before. It's not on the authenticity.

"THE COURT: *If not on that basis, I'll overrule the objection.*" (Emphasis added.)

At the conclusion of the testimony for the defense, counsel for appellant moved to strike the exhibit for the reason that it was not proven through "direct testimony from the defendant whether or not he was convicted of any crimes" and for the further reason "he was not asked the question whether or not he was represented by counsel or effectively waived his right to counsel." Opposing the motion, the State explained its position: " . . . I thought it sufficient to introduce the parole [order] to show he had broken his parole. My impeachment on this issue goes simply to the fact he violated one of the conditions of his parole." The motion was denied.

As we read the record, it seems clear that appellant challenged the Parole Order in a manner sufficient to raise the *Burgett* principle (*see, Chenault v. Director*, 28 Md. App. 357, 360-61, 345 A. 2d 440 (1975)); that appellant's counsel was not accorded a timely opportunity to articulate fully all grounds for his objection, *cf. von Lusch, supra;* and that the trial court itself recognized no other possible basis for an objection except lack of authenticity. We think the stern requirements of *Burgett* were violated. *See also, Bailey v. State*, 263 Md. 424, 283 A. 2d 360 (1971); *Anglin v. State*, 28 Md. App. 150, 344 A. 2d 130 (1975); *Carroll v. State*, 19 Md. App. 179, 310 A. 2d 161 (1973); *Moore v. State*, 17 Md. App. 237, 300 A. 2d 388 (1973); *Johnson v. State*, 9 Md. App. 166, 263 A. 2d 232 (1970).

This violation of the *Burgett* principle would ordinarily constitute reversible error. In this instance, however, we take judicial notice of the practice in the Criminal Court of Baltimore in 1963, the year of appellant's conviction of the crime of robbery with a deadly weapon, to assign counsel in all felony cases, and of the docket entries in appellant's case, Indictment No. 354, 1963 Term, which disclose that appellant was represented therein by Norman Hockberg, Esq.

The general rule regarding judicial notice in Maryland is,

as stated in *Fletcher v. Flournoy*, 198 Md. 53, 60, 81 A. 2d 232 (1951), quoting *Morse v. Lewis*, 54 F. 2d 1027, 1029 (4th Cir. 1932), that "a court will not travel outside the record of the case before it in order to take notice of the proceedings in another case, even between the same parties, and in the same court, unless the proceedings are put in evidence. ... ." We feel, however, that in contrast to *Fletcher*,[7] the instant case is one in which the demands of justice *do* suggest an exception to settled rules, an exception recognized in *Morse v. Lewis* and also quoted in *Fletcher v. Flournoy:*

> "But in exceptional cases, as high authority shows, the dictates of logic will yield to the demands of justice, and the Courts in order to reach a just result, will make use of established and uncontroverted facts not formally of record in the pending litigation."

Here, we are confronted with an appeal in a case which has been tried twice, the first resulting in a mistrial. The second trial consumed ten days and some 23 witnesses testified. It would defy logic and any notion of fundamental justice and of judicial economy if this case were to be reversed solely on the ground of a violation of the *Burgett* principle, when it is a fact of public record that appellant *was* represented by counsel in connection with the prior conviction and, as appears from the decision of the Court of Appeals in *Gill v. State*, 265 Md. 350, 289 A. 2d 575 (1972), reversing *Gill v. State*, 11 Md. App. 378, 274 A. 2d 667 (1971), we are not permitted the alternative of a remand, without affirmance or reversal, for the limited purpose of receiving in evidence the docket entries in the prior case.

Reliable authority exists in support of our position. Thus, in *Moore v. Estelle*, 526 F. 2d 690 (5th Cir. 1976), the Court of

---

7. *Fletcher* was before the Court of Appeals from summary judgments and orders refusing to strike out the summary judgments for the defendants in two ejectment cases. It was held that neither the trial court in an ejectment action nor the Court of Appeals would take judicial notice of proceedings in a prior case in a Circuit Court from which the instant case had been removed, and which appellants claimed fully settled the controversy.

Appeals took notice of various state and federal court actions upon a prisoner's previous *habeas corpus* petitions to ascertain, *inter alia*, that petitioner had been represented by different counsel at trial and during the collateral attack. In *United States ex rel Geisler v. Walters*, 510 F. 2d 887 (3d Cir. 1975), the appellate court took notice of a state prisoner's brief in his state court appeal in order to determine that he had exhausted his state remedies.

Similar results have obtained in state courts. In *Hartman v. Joy*, 365 N.Y.S.2d 182 (App. Div. 1975), the court, in deciding a rent control case, made the following statement:

"The reference to the Civil Court action, while it is *dehors* the record, is a matter of which we can take judicial notice. Besides, it is accurate information and a public record, and would help to speed resolution of the situation." 365 N.Y.S.2d at 184.

In a paternity case the California Court of Appeal judicially noticed certain documents concerning a prior custody action. The court there said, in a footnote:

"These papers were not part of the record in the juvenile court proceeding from which this appeal is taken. Ordinarily matters not presented to the trial court are not a permissible part of the record on appeal and will not be considered by the reviewing court. [Citation omitted.] We are impelled to recognize this as an exceptional situation and shall take judicial notice of these papers in order to prevent prolongation of this litigation. . . ." *In Re Lisa R.*, 115 Cal. Rptr. 859, 863 (1974).

And in *Garrett v. Osborn*, 431 P. 2d 1012 (Colo. 1967), a case concerning the denial of a motion for a new trial on the ground of inadequacy of counsel the state supreme court took judicial notice of the fact that the trial attorney of plaintiff in error had been disbarred.

While no Maryland case specifically prescribes the limits beyond which an appellate court may not notice facts

outside the record,[8] the Court of Appeals in *Davidson v. Miller*, 276 Md. 54, 67, 344 A. 2d 422 (1975), took judicial notice of data furnished by the Eighth Circuit Administrative Office in reaching the conclusion that the application of Art. IV, § 8 of the Maryland Constitution ("Removal of Causes") was violative of the Equal Protection Clause of the United States Constitution. In *Jones v. State*, 29 Md. App. 182, 192, 348 A. 2d 55 (1975), *cert. granted*, February 5, 1976, this Court declined to take similar notice of "court records and statistics." In the instant appeal, however, the indisputability of the fact that appellant was represented by Mr. Hockberg makes this a case in which refusal on our part to notice the official records of the Criminal Court of Baltimore would, to paraphrase the holdings in New York and California, hinder resolution of an exacerbated situation and needlessly prolong litigation. It would, moreover, be contrary to the demands of logic and justice.

### e. *Claimed Amnesia and Alleged Deprivation of Fair Trial*

Placing heavy reliance upon the case of *Wilson v. United States*, 391 F. 2d 460 (D.C. Cir. 1968), appellant contends that his claimed alcohol-induced amnesia covering the period of approximately one hour (the time between his departure from the local bar and his apprehension by the police) precluded him from receiving a fair trial; and that the trial judge failed to give proper consideration to this contention.

Procedurally, the issue was presented to the trial judge in the form of a motion for appropriate relief, heard in open court on March 11, 1975, after conviction and prior to disposition. The "appropriate relief" sought by appellant was an order setting aside his conviction.

At the hearing on the motion, appellant's counsel made a proffer that he and two other defense counsel would testify that, in speaking with appellant, he informed each of them

---

8. Professor McCormick speaks of the "axiom that these [appellate] tribunals can take judicial notice to the same extent as can trial courts." McCormick, *Evidence* (2d. ed. 1972), § 333 at 773.

from the outset that he had no recall of the incident surrounding the firing of the gun; that he was unable to recall to them or to assist them in reconstructing the events that occurred inside the house on the afternoon in question; that the period of his memory lapse began in the local bar; that a State witness had testified that the appellant left the tavern in the company of three other persons; and that the appellant's sister, Ella Mae Powell (who had been called as a State's witness during the first trial but did not testify at the second) would testify that when the appellant arrived at her house after leaving the bar, he said something to the effect, "I am in trouble, I have been in an argument with three guys and I am in trouble."

We find appellant's reliance upon the *Wilson* case to be altogether misplaced. There, the appellant and an accomplice were involved in a serious accident in the District of Columbia while attempting to elude the police in a stolen car after a robbery. The accomplice was killed in the accident and appellant Wilson was so badly injured that he lost all recollection of the events on the day of the robbery. The government conceded, as the majority opinion of Judge J. Skelly Wright discloses, that the appellant suffered from permanent retrograde amnesia as a result of which he had no recollection of any of the events alleged in the indictment.[9]

---

**9.** Amnesia *per se* does not bar prosecution. United States v. Sullivan, 406 F. 2d 180 (2d Cir. 1969); Wilson v. United States, *supra;* State v. McClendon, 437 P. 2d 421 (Ariz. 1968); Reagon v. State, 251 N.E.2d 829 (Ind. 1969); Commonwealth ex rel. Cummins v. Price, 218 A. 2d 758 (Pa. 1966); State v. Pugh, 283 A. 2d 537 (N.J. App. Div. 1971). We have found no Maryland criminal case wherein the issue has been squarely presented. *See generally,* Annot. 46 A.L.R.2d 544; and *see* Lester v. State, 370 S.W.2d 405 (Tenn. 1963). To have a fair trial the defendant must be competent to stand trial, *i.e.,* to be able to consult with his lawyer with a reasonable degree of rational understanding and have an understanding of the proceedings against him. In Wilson, Judge Wright stated:

"A prediction of the amnesic defendant's ability to perform these functions must, of course, be made before trial at the competency hearing. But where the case is allowed to go to trial, at its conclusion the trial judge should determine whether the defendant has in fact been able to perform these functions. He should, before imposing sentence, make detailed written findings, after taking any additional evidence deemed necessary, concerning the effect of the amnesia on the fairness of the trial."

In the instant case there is no such concession on the part of the State and, as the trial court held in ruling upon the motion for appropriate relief, the jury by its verdict clearly disbelieved appellant's testimony concerning the alleged alcoholic blackout.[10] How, the trial court questioned, could it be effectively argued that appellant was deprived of a fair trial if the clear indication of the jury's verdict was that no amnesia in fact existed? The logic in the court's position is unassailable. Beyond this, the trial court in its ruling on the motion adverted to the holding of this Court in *Parker v. State*, 7 Md. App. 167, 254 A. 2d 381 (1969), and observed that there was no evidence in this case to suggest the presence of involuntary intoxication; that appellant had been found competent to stand trial; that the high quality of professional assistance rendered him by the Office of the Public Defender "negates the argument that the defendant did not receive a fair trial" and that the prosecution had fully cooperated with the defense by affording complete discovery.

On the basis of the record before us, therefore, we reject appellant's final contention that the trial judge did not give proper consideration to the question of whether appellant's amnesia precluded him from receiving a fair trial.

*Judgments affirmed.*

---

**10.** In his pretrial ruling on competency, Judge Ross did find, as a fact, that appellant had no recall. That, however, was "for the purpose of this hearing"; and appellant was found competent to stand trial.