## MACK CAMPBELL *v.* STATE OF MARYLAND

[No. 1368, September Term, 1976.]

*Decided July 13, 1977.*

90

The cause was argued before DAVIDSON, LOWE and MASON, JJ.

*Henry L. Belsky, Assigned Public Defender,* with whom was *Jana R. Barnett* on the brief, for appellant.

*Gilbert H. Robinette, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *William M. Monfried, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

to ete a mous [1]

"The sporting theory of justice, the 'instinct of giving the game fair play' ", as Professor Wigmore has put it, "is so rooted in the profession in America that most of us take it for a fundamental legal tenet." [2] But the will to win, which is ordinarily a commendable attribute, has, because of society's pressures, too often caused a disproportionate priority to be established in the order of things. Thus, when a prosecutor becomes so obsessed with catching the rats that his concern causes him to "weyveth [the] milk, and flesh" of the law (justice and fair play), either he must reorder his priorities or the judicial system will do it for him. An attorney is neither obliged nor expected to win at all costs, and as pointed out by Doctor Samuel Johnson, he is an ingenious counsel who but makes the most of his cause. When a prosecutor moves beyond that goal he infringes upon the "conveniently vague" due process limitation guaranteed an accused. It is the Fourteenth Amendment which obliges us to do what is just, not merely refrain from doing what is improper.

---

1. "Lat take a cat, and foster him wel with milk,
And tendre flesh, and make his couch of silk,
And lat him seen a mous go by the wal;
Anon he weyveth milk, and flesh, and al,
And every deyntee that is in that hous,
Swich appetyt hathe he to ete a mous."
Geoffrey Chaucer, *Canterbury Tales — The Maunciples Tale* 1.71.

2. Rosco Pound, "The Cause of Popular Dissatisfaction with the Administration of Criminal Justice", 29 A.B.A. Rep. 395, 404.

Because due process is not confined within a permanent catalogue of what may at a given time be deemed the limits or essentials of fundamental rights, *Wolf v. Colorado*, 338 U. S. 25, 27, the questions that appear before us of what is deemed reasonable and right are as abundant as man is innovative. The device used by the prosecutor in this case was effective (at that trial at least), perhaps even innovative. But it was an affront to the Sixth and Fourteenth Amendments.

> the duty of the prosecutor is to seek
> justice, not merely to convict [3]

Mack Campbell was the driver of an automobile and one of four men arrested after a high speed chase following an armed robbery of the Jiffy Trailer Company. His defense was uncomplicated. He admitted that one of the other three occupants of the automobile was a friend, and that he had at his friend's request driven the three to the Jiffy Trailer Company. However, he contended, he had done so because his companions had wanted to rent a truck there. Again at the friend's request, he agreed to wait until they ascertained whether the company was open for business and, if it was not, to drive them to an alternative source for a truck rental.

When the three men returned, they did so in a rush. One put a gun to appellant's head and directed him to depart post haste — which he did without hesitation notwithstanding a police car which took up pursuit. His ordeal ended abruptly when his automobile collided with another.

The defense of coerced participation obviously rested upon credibility. To bolster appellant's story, one of the other participants, David Byrd (also known as George Jones, Jr.), who had not been tried for the robbery in question, had agreed to testify in appellant's behalf. Stets had been entered in Byrd's case at the request of an Assistant State's Attorney, whose stated reason for the requested stets was that:

"Defendant [was] currently serving 20 yr. sentence.

R. Hedeman A.S.A."

---

**3.** *ABA Standards Relating to The Administration of Criminal Justice,* § 1.1 (c); see United States v. Agurs, 427 U. S. 97, 110-111.

On the day appellant was to be tried by a jury in the Criminal Court of Baltimore, Assistant State's Attorney William M. Monfried, who was assigned to prosecute him, began his case with an announcement to the court:

> "Prior to calling the Campbell case for trial, the State at this time will move to reopen stets as to Mr. David Byrd, also known as George Jones, in Indictments 57535046, 49 and 57. Mr. Byrd is present as is his counsel."

This evoked vociferous complaints, not only from appellant, but from Byrd's attorney as well. Presumably expecting the court to believe that the timing of the opening was coincidental, the prosecutor argued that his reason for opening the stets was totally unrelated to whether Byrd testified:

> "I could care less if he testifies at all. The cases are being reopened purely and simply because Mr. Dunnigan [4] indicated to me he felt it was a nonproductive disposition to give any more time for Mr. Byrd. I vehemently disagree with that and I fought this in our office. That is not the situation for the prosecutor to act as a judge and sentencer. If the Court feels it is enough time it will give him a concurrent sentence. I told Mr. Dunnigan that. I told Mr. Dunnigan I was reopening the trials. If Mr. Byrd says something that is inculpatory, may be used against him or not, I don't know. The stets are not being reopened because he is a potential defense witness. They are being reopened because I don't agree with the State's Attorney stetting them. I know of no law, judicial decision whatsoever, in the Supreme Court or this state to reopen a stet."

The witness's attorney, however, pointed out that the

---

4. The proper name of the party referred to is Hedeman. Undoubtedly the stenographer's notes erroneously reflected "Dunnigan".

prosecutor had previously advised him of the jeopardy in which Mr. Byrd would be placed if he did testify:

"I would like to repeat, Mr. Monfried did say to me while he is not making any promises or deals, what my client does in this trial could have an effect on what his intentions will be when the stets are reopened."

This the prosecutor readily acknowledged:

"It depends a great deal on what Mr. Byrd testifies to. If Mr. Byrd gets on the stand and says he participated in this, darn right, I'll go to trial on this."

Appellant's attorney desperately tried to overcome this sudden impediment to his client's defense but saw his protestations to the opening of the stets [4A] go unheeded. Instead, although it was to have been appellant's trial set for that hour, he waited while the witness Byrd was arraigned in that courtroom, immediately after which his own case was called.

After the jury had been selected, the State had put on its case-in-chief and the jury was removed from the courtroom, appellant's counsel again sought to overcome the obstacle confronting his key witness. He renewed his opposition to the opening of the stets and, alternatively, asked the court to grant Byrd immunity. Denied both remedies, he proposed to prove before the jury that the prosecutor's sole motive in opening the stets was to obstruct appellant's defense in suppressing a key witness's testimony by "intimidating, threatening and using the judicial system". The court would only agree to hear this testimony out of the presence of the jury. Even that ruling brought the prosecutor to his feet, demanding a right "to defend" himself, which he began to do immediately from the trial table. When the defense attorney requested that he be put under oath the prosecutor told him to "Keep quiet", and again proceeded to impress upon the

---

**4A.** For a discussion of history and use of stet processus see State v. Jones, 18 Md. App. 11, 33-37.

court, through argument, his version of why Byrd's stets had been opened.

be just before you are generous

During the prosecutor's unsworn address to the court, he again explained that his opening of the stets had nothing to do with whether the witness testified. He argued that any inference of impropriety from the timing was unjustifiable because, in reality, the opening of the Byrd stets immediately prior to the Campbell trial was a manifestation of the State's generous display of fairness to Mr. Byrd:

> "I could have had Mr. Byrd walk onto the stand, inculpate himself to the fullest extent. The highest form of self-incrimination, opened up the stets and said now, Mr. Byrd, look what you did, you have yourself under oath confessing to a crime, now I'm going to reopen the stet. That would have been dirty pool. I was fair and open with Byrd and told him I was reopening the stet whether he testified or not. If he exercises his right under the Fifth Amendment, it is his choice. I want it known to him if he gets on the stand the stets are open and anything he says may be used against him. His counsel is here. To this day I don't know whether Mr. Byrd is going to testify. If he chooses to testify, fine. If not, fine. The stets are open. It has nothing to do with the case of *State versus Mack Campbell.* The State is not coercing him to take the stand or not. I think any hearing is a waste of the Court's time."

The court rejected the prosecutor's plea to deny a hearing out of the jury's presence, but elected to decide later if the evidence so taken would be admissible before the jury.

The first witness called during the hearing was the attorney for Byrd. He explained how Byrd's stets had occurred and how he had been called out of another trial by

Mr. Monfried the day before the Campell case was set to be tried and told that Byrd's stets would be opened:

". . . I asked Mr. Monfried on what basis he wanted to reopen. He made known to me he wanted to reopen but thought to what his decision will be whether he will try my client will have to do with the way my client testifies or not in this particular matter. He did not come in and say to me for a certainty he wouldn't try him. He said he would more or less make a decision later.

. . .

Mr. Monfried led me to believe, not in the exact words, if he didn't testify that would have a lot to do with his determination whether or not to follow through with the prosecution. He never came out and said if he testifies I will try him and if he won't I won't, but all the inferences were there by way of conversation it might be favorable to Mr. Jones not to testify as to what effect that would have on a decision whether to retry him."

On cross-examination by the prosecutor the attorney made it clear that there was no overt threat, but that the underlying message was unmistakable:

"You didn't promise us anything but the whole conversation, taken in proper prospective, being around the courts, understanding everything, how the system works, it was given me the impression by our conversation if my client did not testify his case, the stets opened would be re-evaluated, meaning to me if he is a good boy, keep his mouth shut, he probably has nothing to worry about."

The second person to testify was the law clerk of Mr. Byrd's attorney. He had taken an initial call from the prosecutor and the message he was asked to convey to his boss from Mr. Monfried was somewhat less subtle:

"I said 'What do you want me to tell him?' He said

'Tell him we are going to reopen the stets and if his client is willing to not take the stand I won't reopen the stets'.

. . .

That seemed peculiar to me. I said 'You better tell him yourself'. I gave him Mr. Sellman's phone number and that was the end of it. After that I relayed the message to his personal secretary later."

In answer to Mr. Monfried's question on cross-examination, the clarity of the clerk's recollection was unmistakable:

"Then you said 'Tell Allen to tell his client not to testify and if he doesn't I won't reopen the stets', and that sounded peculiar to me."

Finally, David Byrd testified. After being fully warned of the potential consequences of any testimony inculpating himself, he declined to testify in the Campbell case. He did testify, however, that before the stets were opened he had agreed to testify for appellant. He said he had changed his mind on the basis of the advice his counsel had given him after the stets were opened. He also testified that during a conversation between his attorney and the prosecutor, Mr. Monfried

" . . . told me if I testified on behalf of my co-defendant the stets would be reopened and if I didn't they would leave it the same. They would leave them closed."

It should again be noted at this juncture that there was no testimony or other evidence offered by the prosecutor to controvert the witnesses put on by appellant. While we are fully cognizant of the position of a prosecutor as an officer of the court as well as of the State, we decline to hold that his unsworn argument or the inference from his questions on cross-examination were sufficient to overcome the sworn testimony of appellant's witnesses. Evidentially, the accusations of coercion or suppression stood unrebutted, which

undoubtedly accounted for the fact that the trial judge assumed all of appellant's allegations to have been true. He decided, however, that the tactical timing of the opened stets and the imputed motives of the prosecutor were of no consequence, since Byrd would have to have been fully advised of his rights and the consequences of testifying with or without the implied threat, and he would have probably declined when he found he was subject to prosecution, stet or no. The judge concluded by saying:

> "I don't see the State has done anything wrong in this case and I deny the motion."

### epilogue

Two months after Mack Campbell was convicted an entry [5] was made in the docket of the case of David Byrd, which began:

> "Mr. Clerk:
> Please Enter a Stet in this Case because"

and which was followed by the handwritten reason therefor and the signature of the prosecutor making the request:

> "defendant is currently serving 20 yrs
> [s] Monfried, ASA".

There followed the final entry initialed by the same trial judge:

> "Stet ordered for the above stated reason.
> [s] M.M.C.
> Judge"

### due process of law

Since the 14th century, Anglo-Saxon justice would permit "no man ... be ... taken nor imprisoned ... without being

---

5. We deny appellant's motion to supplement the record by appending the docket entries in the Byrd case. It is apparent, however, under these circumstances that we may judicially notice the official entries on the records of the Criminal Court of Baltimore. While we will not generally go beyond the record of a case before us and take notice of proceedings in another case, we may do so where justice demands it. Fletcher v. Flournoy, 198 Md. 53, 60-61. We hold that this is such a case. *See* James v. State, 31 Md. App. 666, 684-687.

brought in answer by due process of law." Statute of Westminster, 28 Edw. III (1354). The phrase "due process of law" was used and the concept reavowed in the Fifth Amendment to our Constitution, and its applicability was subsequently broadened by the Fourteenth Amendment. While agreeing with Charles Hough that the "phrase is of convenient vagueness", 32 Harv. L. Rev. 218, from time to time the Supreme Court has had occasion to bring it into better perspective. In *Washington v. Texas*, 388 U. S. 14, 19, the Court said:

> "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law."

That holding was the fulcrum of the decision in a later case more factually apposite than *Washington* to the case before us. In *Webb v. Texas*, 409 U. S. 95, the trial judge so frightened a witness by emphasizing to him the consequences of perjuring himself that the witness declined to testify. There, as here, the implications and circumstances denied appellant "the right to present a defense, the right to present the defendant's version of the facts. . . ."

The reversal in *Webb* rested upon what might have been "the unnecessarily strong terms used by the judge [which] could well have exerted such duress on the witness's mind as to preclude him from making a free and voluntary choice whether or not to testify." *Id.* at 98. It made little difference that the witness may have declined to testify there had he been apprised of the consequences of perjury in less threat-

ening terms. Likewise, it is of no consequence that the witness here might have declined to testify had he known that entry of a stet was not a barrier to prosecution. Here the trial judge recognized that:

" . . . the testimony is quite clear from what Mr. Byrd stated he would have testified if he were not advised the stets would be opened."

We know Byrd's decision in face of the threat of prosecution. We can only speculate what might have happened had the threat not appeared.

Under the light cast upon the due process clause by *Webb* and *Washington*, it is hard to imagine a more fundamentally unfair factual predicate for a denial of due process than that which was uncontrovertibly proven in the instant case. As *Webb* and *Washington* point out, the right of a defendant to present witnesses in his defense is a fundamental element of due process. Because appellant's defense relied solely upon the believability of his version of the facts, a participant who would presumably inculpate himself was a key to success, and the use of the coercive procedural measures which effectually drove the witness from the stand deprived the appellant of due process.

There are fortunately few cases of denial of due process by government coercion of witnesses that have surfaced throughout the country, but these few reach results similar to that at which we now arrive. For example, in *State v. Brown*, 543 S.W.2d 56, the Missouri Court of Appeals held that a warning which was given a defense witness by the prosecutor, carrying the implication that the State had enough evidence to proceed against the witness but would do so only if he testified, operated to prevent the defendant from presenting a witness crucial to his defense and, as such, was violative of due process where the warning had the effect of causing the witness to refuse to testify:

"The intimidating warning given by the prosecutor in the case before us drove Mr. Burke

> from the stand and prevented the defendant from presenting a witness crucial to his defense. As in *Webb*, this practice must be condemned as depriving a criminal defendant of due process. We conclude that appellant's conviction must, therefore, be reversed and appellant retried in this matter." *State v. Brown, supra,* 543 S.W.2d at 59.

See also *United States v. Thomas,* 488 F. 2d 334; *United States v. Smith,* 478 F. 2d 976; *Bray v. Peyton,* 429 F. 2d 500; *Commonwealth v. Jennings,* 311 A. 2d 720. That the threat here was conveyed through and in the presence of counsel is a difference without distinction.

We too will reverse the judgment of the trial court. However, the question remains whether appellant can now obtain a fair trial if we remand. It has been said on a federal level that where similar prosecutorial misconduct caused a defendant's principal witness to withhold testimony which would otherwise have been available to defendant, out of fear of self-incrimination, due process may demand that the government at the new trial request use immunity for that witness, *United States v. Morrison,* 535 F. 2d 223, 228-229, a procedure which is available under Maryland law only in a limited number of instances.[6]

While we hesitate to intrude upon a prosecutor's prerogatives without good reason for believing they will be abused, we are compelled to note that if the Byrd stets are again opened the State will be doing so — at least by appearance — for the purpose of obstructing justice. In light of the initial opening, allegedly done to allow the State a full review of its reasons for stetting the cases, and in light of the second entry of the stets for precisely the same reason given for entering them the first time, the State could hardly justify opening them again without a substantial showing of good cause. Although we do not rule, as a matter of law, that such a showing could not be made, we reiterate that it would have to be substantial. Accordingly, Mr. Byrd

---

6. *See* Md. Code, Cts. and Jud. Proc. Art., § 9-119; Art. 27, §§ 23, 24, 39, 262, 371, 400, 540; Art. 33, § 26-16.

must now be apprised anew of his rights by his counsel in light of our opinion, and he may elect or decline to testify without fear of reprisal for his decision. This should provide appellant substantial justice upon retrial — and that is the best the system can offer.

*Judgments reversed.*

*Case remanded for new trial.*

*Costs to be paid by Mayor and City Council of Baltimore.*